694 P.2d 267

## SALT RIVER PROJECT AGRICULTUR-AL IMPROVEMENT AND POWER DISTRICT, Plaintiff-Appellant,

v.

## WESTINGHOUSE ELECTRIC CORPO-RATION, a Pennsylvania corporation, Defendant-Appellee.

### No. 1 CA–CIV 5817.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 29, 1983.

Black, Robertshaw & Copple, P.C. by Richard A. Black, Philip C. Thorpe, Phoenix, for plaintiff-appellant.

Lewis & Roca by Douglas L. Irish, Paul G. Ulrich, Edward M. Lewis, Phoenix, for defendant-appellee.

## OPINION

CORCORAN, Judge.

This is an appeal from a final partial summary judgment entered in favor of appellee Westinghouse Electric Corporation (Westinghouse) in a commercial products liability case. We affirm.

In 1970 Westinghouse sold a gas turbine unit to appellant Salt River Project Agricultural Improvement and Power District (SRP) for use at SRP's Kyrene Power Plant in Tempe, Arizona. The turbine was sold along with a device, known as a "P–50 computer," which automatically started and operated the turbine. The price was $4,517,815. SRP operated two such Westinghouse turbines. Three years later, in 1973, SRP purchased from Westinghouse a secondary control device, known as a Local Maintenance Controller or "LMC." This device was designed to permit operation of the gas turbine unit during periods when the P–50 computer was being maintained or repaired. SRP's annual report for 1973 showed that it was Arizona's second larg-

est electric utility with net profits of $17,-459,416 on power production revenues of $128,334,924. Its assets were $706,407,886 and it generated 7,152,198,900 kilowatt hours of electricity.

The sale of the LMC was documented in part by SRP's "Purchase Order" and Westinghouse's "Acknowledgement." Paragraph 1 of the "Terms and Conditions of [SRP's] Purchase Order" states:

> This Purchase Order becomes a binding contract, subject to the terms and conditions hereof, upon receipt by Buyer at its Purchasing Department of the acknowledgement copy hereof, signed by Seller, or upon commencement of performance by Seller, whichever occurs first. *Acceptance of this Purchase Order must be made on its exact terms and if additional or different terms are proposed by Seller such response will constitute a counter-offer,* and no contract shall come into existence without Buyer's written assent to the counter-offer. Buyer's acceptance of or payment for material shipped shall constitute acceptance of such material subject to the provisions herein, only, and shall not constitute acceptance of any counter-offer by Seller not assented to in writing.

(Emphasis added.) Westinghouse's "Acknowledgement" states:

> YOUR ORDER HAS BEEN ENTERED AS OUR GENERAL ORDER (GO) NUMBER AS SHOWN ABOVE. Our Regional Order Correspondent will be better able to serve you if our GO Number is referred to in all communications ... SEE REVERSE SIDE FOR TERMS AND CONDITIONS

[Reverse Side]
TERMS AND CONDITIONS

> The conditions stated below shall take precedence over any conditions which may appear on your standard form, and no provisions or condition of such form except as expressly stated herein, shall be binding on Westinghouse.
>
> . . . .

WARRANTY—Unless a different warranty was stated or referred to in the Westinghouse quotation ... Westinghouse warrants that the products sold hereunder shall be of the kind and quality described in this quotation and shall be free of defects in workmanship or materials, and Westinghouse shall, in complete fulfillment of its liabilities under this warranty and if given prompt notice by the Purchaser, correct, by repair or replacement, f.o.b. its factory, any nonconformity which shall appear under proper and normal use of the products within one year after the date of shipment. THIS WARRANTY ... IS EXCLUSIVE AND IS IN LIEU OF ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHER WARRANTY OF QUALITY, WHETHER EXPRESS OR IMPLIED.

LIMITATION OF LIABILITY—Neither party shall be liable for special, indirect, incidental or consequential damages. The remedies of the Purchaser set forth herein are exclusive, and the liability of Westinghouse with respect to any contract or sale or anything done in connection therewith, whether in contract, in tort, under any warranty, or otherwise, shall not, except as expressly provided herein, exceed the price of the product or part on which such liability is based.

Westinghouse's Acknowledgement contained an express warranty and specific exclusions of other warranties, and limitations of liability by: (1) warranting the LMC to be free of defects in workmanship or materials for one year after shipment; (2) excluding implied warranties of merchantability, fitness or otherwise, express or implied; and (3) by providing that in all events Westinghouse's liability, whether in contract, tort or warranty, would not exceed the LMC's purchase price of $15,000.

In May 1976 an explosion and fire occurred in a gas turbine manufactured by Westinghouse for SRP's Kyrene facility damaging the turbine. The damage was estimated at approximately $1,900,000. SRP and its insurers brought an action against Westinghouse in superior court

alleging that the explosion and fire occurred when the Westinghouse LMC, which was attached to the damaged turbine, malfunctioned.

In its second amended complaint SRP asserted three claims for relief against Westinghouse. Count I alleged a strict products liability theory of recovery; Count II alleged breaches of express and implied warranties arising from the sale of the LMC unit; and Count III alleged that Westinghouse negligently designed, built, installed or maintained the LMC unit, which failed and caused SRP's losses.

After substantial discovery, Westinghouse moved for a summary judgment on Counts I and II and a partial summary judgment on Count III. Rule 56, Arizona Rules of Civil Procedure. Its motion directed to Count III sought to limit SRP's recovery to $15,000, the price of the LMC unit. The trial court granted Westinghouse's motion in its entirety and this appeal ensued.

SRP asserts in this appeal that the trial court erred because: (1) The doctrine of strict liability in tort was applicable to the sale transaction of the LMC; (2) the exclusions and limitations of warranty and liability are not enforceable against SRP; and (3) in the alternative, enforcement of those limitations and exclusions would be unconscionable, and Westinghouse should not be permitted to raise them as defenses. Obviously, Westinghouse contends that the trial court correctly ruled on each of the above issues and that its ruling should be affirmed.

### STRICT TORT LIABILITY

The doctrine of strict liability was developed by the courts to serve certain "social policies" which could not be met in the commercial world of the law of sales and the Uniform Commercial Code (UCC).

As was recognized by the first case to adopt strict liability, *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1962):

[R]ules defining the governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed.

To meet that need the court in *Greenman* adopted the principle that

A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.

59 Cal.2d at 62, 27 Cal.Rptr. at 700, 377 P.2d at 900. Since "[s]ales warranties serve [the] purpose fitfully at best," the doctrine of strict products liability is designed "to ensure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Greenman*, 59 Cal.2d at 63–64, 27 Cal.Rptr. at 701, 377 P.2d at 901. Arizona decisions since *Greenman* applying the doctrine of products liability have in general involved the cost shifting rationale. *See e.g. Tucson Indus., Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972); and *Caruth v. Mariani*, 11 Ariz.App. 188, 463 P.2d 83 (1970).

Strict liability can be seen as a device adopted by the courts as a means to avoid the artificial conditions to recovery in warranty created by rules of privity. *Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal.App.3d 737, 127 Cal.Rptr. 838 (1976); W. Prosser, *The Assault Upon the Citadel*, 69 Yale L.J. 1099, 1130–34 (1960). The first issue presented by this appeal is whether strict liability was intended to grant recovery in tort to a substantial commercial purchaser in privity with the manufacturer, beyond that which is contemplated by the UCC where the sale transaction itself is governed by the principles of UCC.

The question currently before us, one of first impression for Arizona courts, has

been addressed by a number of other jurisdictions.

In *Scandinavian Airlines System v. United Aircraft Corp.*, 601 F.2d 425 (9th Cir.1979), Scandinavian Airlines, a large international air carrier, sought recovery from United Aircraft, a manufacturer of airplane engines, for the failure of two engines which resulted in damage to the engines and to the aircraft on which they were installed. A summary judgment for the manufacturer on the strict liability theory was affirmed. As in this case, no personal injury or damage to the property of third parties was involved. The suit was between the buyer and seller, both of whom were sophisticated business entities with no disparity in bargaining power. The court held as a matter of law that the doctrine of strict liability does not apply.

In *Iowa Electric Light & Power Co. v. Allis-Chalmers Mfg. Co.*, 360 F.Supp. 25, 32 (S.D.Iowa 1973), the court ruled that, under circumstances similar to those in this case, the theory of strict liability does not apply:

> The loss plaintiff is seeking to recover is a commercial loss. The plaintiff is a large corporation, fully cognizant of commercial law. The doctrine of strict liability in tort, designed to aid the consumer in an unequal bargaining position who is physically injured, loses all meaning when a large public utility or other large company is the plaintiff and is suing solely for commercial loss. Accordingly, under these facts, the Court holds that the doctrine of strict liability in tort is not available to this plaintiff.

Likewise in *Kaiser Steel Corp. v. Westinghouse Electric Corp., supra,* the court recognized that the doctrine does not apply to commercial transactions such as this. In *Kaiser,* a steel mill operator claimed that Westinghouse as the seller of an allegedly defective electric motor was liable for both direct and consequential damages. The court held as a matter of law that the doctrine of strict liability does not apply in circumstances involving commercial consumers.

We thus conclude that the doctrine of products liability does not apply as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in it.

55 Cal.App.3d at 748, 127 Cal.Rptr. at 845.

In *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.*, 422 F.2d 1013 (9th Cir.); *cert. denied,* 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970), the district court's dismissal of a strict liability consequential damages claim was affirmed by the court of appeals because the principles underlying strict liability are not to be extended to cases involving essentially commercial problems in the sale of industrial products between large corporations with equal bargaining power:

> The circumstances of this case do not bring the plaintiff within that class of consumers, type of transactions, or damages suffered that created the need for relief based on strict liability in tort. Neither the philosophy nor the theory of the doctrine of strict liability in tort nor the actual holdings of the cases involved support an extension of the doctrine of strict liability in tort to the present facts.

422 F.2d at 1020. *See also Tokio Marine and Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 939 (2d Cir.1980); and *Idaho Power Co. v. Westinghouse Electric Corp.*, 596 F.2d 924, 927–28 (9th Cir.1979).

We have examined the foundational reasons underlying the creation of strict products liability to ascertain whether the purposes of the doctrine would be defeated or diluted by affirming the trial judge's decision. The trial judge's decision does not conflict with the risk distribution rationale in Arizona products liability law. SRP and Westinghouse are each large commercial enterprises who were dealing from positions of relatively equal bargaining strength. The purchase of the LMC was conducted in a commercial-industrial context in which each side had an opportunity to deal with the other in negotiating the

sale and its terms. Further, both are business entities who sell a product or perform a service which is ultimately paid for by Westinghouse's or SRP's customers. As a result, "[w]hether the loss is thrust initially upon the manufacturer [Westinghouse] or customer [SRP], it is ultimately passed along as a cost of doing business included in the price of the products of one or the [services provided by the] other and thus [is] spread over a broad commercial stream." *Kaiser Steel Corp.*, 55 Cal. App.3d at 748, 127 Cal.Rptr. at 845; *see also, Scandinavian Airlines*, 601 F.2d at 428. Unlike most ordinary consumers, presumably SRP can allocate its risk of loss equally as well as Westinghouse. There-.fore, the societal interest in loss shifting which is present in most product liability cases is absent here.

Although of less significance than the risk spreading rationale, several other policies have been identified as underlying the doctrine of strict products liability. Among these are the consumer's difficulty in inspecting for defects and the consumer's difficulty in trying to prove negligence. There is nothing in the record to indicate that SRP lacks technical knowledge and expertise which would burden members of the general public in proving negligence in designing or manufacturing the LMC. Moreover, SRP does not face problems of privity as an artificial barrier which the doctrine of strict liability seeks to avoid.

■ We find, therefore, that the trial judge correctly ruled as a matter of law that the doctrine of strict liability is not available to SRP in this case. "[T]he adequacy of sales law controls the use of tort law, since the need to resort to tort law depends upon the extent to which sales law does or does not afford protection to a disappointed buyer." Comment, *Manufacturer's Responsibility for Defective Products: Continuing Controversy Over the Law to be Applied*, 54 Cal.L.Rev. 1681, 1690–91 (1966) quoted in *Kaiser Steel Corp.*, 55 Cal.App.3d at 747, 127 Cal.Rptr. at 845. Because our legislature through the adoption of the UCC, *see* A.R.S.

§§ 44–2201, *et seq.*, has defined the precise conditions to, and extent of, liability for defective products in situations covered by the code, and thus, acknowledged the adequacy of the protections afforded, in deference to the legislature, we must not create rules of liability which displace those of the UCC. *Kaiser Steel Corp., supra; see Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc.*, 136 Ariz. 444, 666 P.2d 544 (1983).

■ The rule of strict product liability shifts the risk by resort to tort law where a statutory scheme does not adequately protect *ordinary consumers* who do not deal in a commercial setting from a position of relative equal bargaining strength. In this case, the statutory principles of sales warranties work well. *Seely v. White Motor Co.* 63 Cal.2d 9, 16, 45 Cal.Rptr. 17, 22, 403 P.2d 145, 150 (1965). Accordingly we will not displace the statutory scheme of the UCC. *See Arrow Leasing Corp.*, 136 Ariz. at 449, 666 P.2d at 549.

### EXPRESS AND IMPLIED WARRANTIES

Count II of SRP's second amended complaint alleged Westinghouse breached express and implied warranties. In its motion for partial summary judgment, Westinghouse argued that the terms of its "Acknowledgement" had successfully excluded all express and implied warranties, with the exception of the one-year express warranty that had expired before SRP's claim arose. The superior court agreed and granted summary judgment dismissing Count II, and granted a partial summary judgment on Count III limiting SRP's damages, regardless of its legal theory, to the purchase price of the LMC in accordance with the language of the Acknowledgement. We agree with the trial court's judgment.

Before proceeding, it is important to note that SRP does not dispute the legal import of the warranty exclusion and liability limitation language contained in the Westinghouse Acknowledgement. SRP candidly concedes that "if these provisions did in fact become part of the contract, there is

no question but that they were effective to restrict SRP's recovery for breach of any express warranties to a one-year period; to disclaim any liability for breach of implied warranties unless asserted within one year; and finally to limit Westinghouse's tort liability to the price of the product, or $15,-000." SRP's sole quarrel with the summary judgment entered on Counts II and III is that the provisions of the Westinghouse Acknowledgement do not control. We find as a matter of law that the exclusions of warranty and limitations of liability set forth in Westinghouse's Acknowledgement form are enforceable against SRP.

Paragraph I of the "Terms and Conditions of [SRP's] Purchase Order" dictated how the SRP order could or could not ripen into a binding contract by expressly providing: (1) that it could only be accepted on its "exact terms"; (2) that any contrary document would constitute only a "counter-offer," and (3) that no contract would result from such an exchange unless SRP assented to the counter-offer in writing.

■ The Westinghouse Acknowledgement did not accept SRP's Purchase Order on its "exact terms." The Acknowledgement's warranty exclusions and limitation of liability clauses are substantially different from those contained in the SRP Purchase Order; therefore, the Acknowledgement became a "counter-offer" as was contemplated by the express terms of SRP's Purchase Order. The pivotal question before us then is whether SRP accepted the Westinghouse counter-offer.

■ The record reveals that SRP failed to object to the changed terms contained in the Acknowledgement. SRP took delivery of the LMC, paid for it and made extended use of it. *See Gilbert & Bennett Mfg. Co. v. Westinghouse Electric Corp.,* 445 F.Supp. 537, 546 (D.Mass.1977). A contract for the sale of goods may be made in any manner sufficient to show agreement, including *conduct* by both parties which recognizes the existence of a contract. A.R.S. § 44–2311(A), UCC § 2.204(1). Furthermore, an offer to make a contract shall be construed as inviting acceptance in any

manner and by any medium reasonable in the circumstances. A.R.S. § 44–2313(A), UCC § 2–206(1). The "counter-offer" embodied in the Westinghouse Acknowledgement was accepted by SRP's conduct manifested through SRP's acceptance, payment for, and use of the LMC. This was true even in the absence of SRP's express assent. Where, as here, an offeree uses a seller's goods for his own purposes, that action will be deemed to constitute an acceptance of the terms of the counter-offer or offer. *See Beech Aircraft Corp. v. Flexible Tubing Corp.,* 270 F.Supp. 548, 558 (D.Conn.1967), and Corbin, *Contracts* § 75, at 121 (One vol. ed. 1952). While SRP's Purchase Order specifically states that any counter-offer can only be accepted by SRP when that acceptance is in writing, the SRP Purchase Order terms concerning the acceptance of the counter-offer do not control. Because SRP's original offer was rejected, the rejected offer could not govern how the new Westinghouse "counter-offer" could or would be accepted. Absent any limiting language in the counter-offer which would restrict the manner of acceptance, the acceptance of the counter-offer would be governed by the general provisions of the UCC. *See* A.R.S. § 44–2311(A) and A.R.S. § 44–2313(A).

■ We find no support for SRP's argument that A.R.S. § 44–2314, UCC § 2–207, the so-called "battle of the forms" provision, applies in this case because SRP's own Purchase Offer rejected in advance its possible application. The SRP order distinctly stated that a responsive document containing any different or additional terms would operate as a counter-offer and could not be an acceptance of the SRP offer. Under A.R.S. § 44–2313(A), SRP was free to specify the manner in which its offer could be accepted by Westinghouse. *Empire Machinery Co. v. Litton Business Telephone Systems,* 115 Ariz. 568, 572, 566 P.2d 1044, 1048 (App. 1977). According to official comment 1 to § 2–206: "[a]ny reasonable manner of acceptance is intended to be regarded as available *unless the offeror has made it*

*quite clear that it will not be acceptable."* (Emphasis added.) Here, SRP made it "quite clear" in its Purchase Order that it would not accept any terms which were different from those contained in the order. A.R.S. § 44–2314 only comes into play when there has in fact been a "definite and seasonable expression of acceptance." The Westinghouse Acknowledgement was not such an "expression of acceptance" because the SRP Purchase Order would not permit it to be one. Thus, the exchange of documents which occurred in this case is wholly outside the scope of A.R.S. § 44–2314.

SRP next argues that there is a fact question as to whether the so-called Quisenberry letter, a letter which was sent by a Westinghouse representative to SRP several months before SRP issued its Purchase Order, was sufficient to constitute an offer under the UCC. Presumably, if the Quisenberry letter were an *offer,* SRP's Purchase Order would then have been an acceptance and A.R.S. § 44–2314 would be applicable.

We find that the Quisenberry letter does not contain sufficient specificity to be an offer. The letter indicates that the LMC is "under development"; that "information describing the unit [will be] available within the next month"; and Westinghouse promised in the letter that it would provide SRP "with additional information as soon as it is available." The letter did not document a specific sale transaction. The entire thrust of the Quisenberry letter was that the LMC device was being developed and that it would be available in the near future. We find that the letter was not an offer but at most an invitation to make an offer when the device was available.

## UNCONSCIONABILITY

Anticipating this court's finding that the provisions of the Westinghouse Acknowledgement control as the contract, SRP argues that Westinghouse's exclusions of warranty and limitations of liability clauses should not be enforced against SRP, because they are "unconscionable" within the

meaning of A.R.S. § 44–2319, UCC § 2–302. SRP presents three grounds which it believes support its argument that the SRP/Westinghouse contract is unconscionable:

1. The parties never executed a single document setting forth all the terms of their agreement, never resolved the inconsistencies between SRP's Purchase Order and Westinghouse's Acknowledgement, and never agreed to a risk allocation with respect to latent defects, a risk which was known by the parties at that time;

2. The LMC contained a latent defect which was not apparent or obvious to SRP; and

3. SRP was forced to buy the LMC on Westinghouse's terms because it was "the only game in town."

We have reviewed the commercial setting in which the transactions in this case took place, and find that the contract to sell the LMC unit to SRP was not made under circumstances of oppression and unfair surprise. There was no great disparity between the bargaining power of the two parties. At the time of the making of the contract, SRP was conducting a multi-million dollar business. Moreover, SRP cannot claim unfair surprise over the inclusion of the exclusion of warranty and limitation of liability clauses in the Westinghouse counter-offer because SRP had the terms of the counter-offer before it at the time it accepted delivery of the LMC unit. In sum, there simply is no evidence in the record showing that SRP was an unwilling purchaser overreached and forced to yield to onerous terms imposed by Westinghouse. The trial court did not err in determining that the warranty exclusion and limitation of liability clauses under consideration were not unconscionable.

A.R.S. § 44–2311, UCC § 2–204, provides:

A. A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

B. An agreement sufficient to show a contract for sale may be found even though the moment of its making is undetermined.

C. Even though one or more terms are left open the contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Thus, we find no support in the Uniform Commercial Code for SRP's argument that a contract under the UCC cannot arise upon the exchange of documents and conduct of the parties until and unless the parties have engaged in all negotiations necessary, and until and unless the parties sign a single integrated document containing all of the agreed terms and provisions inside its four corners. Furthermore, we find that SRP and Westinghouse *did in fact* "negotiate the risks to be allocated to each [party]." The sequence of events leading up to the sale of the LMC was as follows:

1. SRP sent a Purchase Order to Westinghouse in which SRP said, in effect, that it must have full warranties on the LMC product, that Westinghouse may not limit either warranties or its liability, and that if Westinghouse proposed additional or different terms than those contained in SRP's Purchase Order, Westinghouse's proposal would constitute a counter-offer.

2. Westinghouse replied to the SRP offer by sending to SRP its Acknowledgement. In bold face type the Westinghouse Acknowledgement states, in essence, that Westinghouse would sell the LMC only on its terms and conditions, and thus, gave notice of objection to SRP's terms.

3. SRP received the Westinghouse Acknowledgement and did not object to its terms. Instead, SRP received delivery of the LMC; permitted it to be installed at the Kyrene power plant; paid for the LMC; and used it for more than two years.

While SRP may be operating under the subjective belief that the exchange of documents in this case did not constitute negotiation, this court must look to the objective conduct of the parties—SRP made an offer to purchase the LMC, Westinghouse made a counter-offer concerning the purchase, and SRP, without protest, accepted the terms of that counter-offer by accepting the delivery of the LMC unit and by paying for it.

█ Next, SRP argues that the contract was unconscionable because the alleged defect in the LMC was "latent." However, SRP cites no authority to the effect that an unknown risk cannot be allocated or that a latent defect cannot be a subject of bargaining with respect to clauses disclaiming warranties or limiting liability for the risk or defect when the parties themselves are substantial commercial enterprises. We are of the opinion that the UCC provisions allowing disclaimer of implied warranties and the limitation of liability permit merchants such as these to negotiate and allocate unknown risks of latent defects.

Finally, SRP argues that it was "forced" to buy the LMC on Westinghouse's terms because it was "the only game in town." We are not persuaded by this argument. If SRP was dissatisfied with the P–50 computer which had originally been sold with the Westinghouse turbine, it had the right to revoke its acceptance under the UCC or to sue Westinghouse for breach of whatever warranties had come with the P–50 computer several years earlier. SRP elected of its own free will not to pursue these remedies when the P–50 did not perform as expected. SRP's problems with the P–50 computer did not amount to inability to use the turbine; the record reveals only that SRP was getting "poor performance" from the P–50.

█ We cannot speculate as to how good a deal SRP could have negotiated with Westinghouse concerning warranties for the LMC. The record simply reveals that SRP made an offer for the LMC which included warranties, Westinghouse rejected that offer and made a counter-offer which excluded, in conspicuous bold face type, all warranties except the one-year express

warranty given in the Acknowledgement, and that SRP then proceeded to accept delivery of and pay for the LMC, and placed it in operation. Given SRP's economic size and sophistication in these matters, we can not say that the contract to purchase the LMC was unconscionable absent specific evidence and allegations of overreaching. Evidence showing that one party failed to negotiate a better deal than that actually achieved does not, as a matter of law, establish that the agreement of the parties was unconscionable.

The judgment of the trial court is affirmed.

KLEINSCHMIDT, P.J., and CONTRERAS, J., concur.