SOUTHWEST PET PRODUCTS, INC., an Arizona Corporation; Earth Elements, Inc., f/d/b/a Nature's Recipe Pet Foods, Plaintiff,

v.

KOCH INDUSTRIES, INC.; Koch Agriculture, Inc.; Koch Agri Services; Benson–Quinn Company; Harvest States Cooperatives, Defendants.

No. CIV.A.95–2531PHX–RGS.

United States District Court,
D. Arizona.

June 12, 2000.

James A Craft, Michael R King, Gammage & Burnham PLC, Phoenix, AZ, Peter J Mort, John W Vineyard, David

Thomas Bristow, Irena Leigh Norton, Akin Gump Strauss Hauer & Feld LLP, Riverside, CA, for Southwest Pet Products, Inc.

Gary E Cripe, Cripe & Graham, Upland, CA, Peter J Mort, John W Vineyard, David Thomas Bristow, Akin Gump Strauss Hauer & Feld LLP, Riverside, CA, for Earth Elements Inc.

Thomas G Ryan, Lewis & Roca LLP, Phoenix, AZ, Michael Anthony Ceramella, Robert J McCully, Dean Kuckelman, Koch Industries Inc, Wichita, KS, for Koch Industries Inc.

Mark Allen Mitchell, Marc Andre Al, Rider Bennett Egan & Arundel, LLP, Minneapolis, MN, for Benson–Quinn Co.

Mary G Isban, Phoenix, AZ, Robert J Bruno, Teilborg Sanders & Parks PC, Phoenix, AZ, Barry R Schirm, David K Schultz, Grace Genson Cosgrove & Schirm, Los Angeles, CA, for Harvest States Cooperative.

Thomas G Ryan, Randall Pepetti, Lewis & Roca LLP, Phoenix, AZ, William G. Levi, Lana M. Knedlik, Sonnenschein Nath & Rosenthal, Kansas City, MO, Michael Anthony Ceramella, Robert J McCully, Dean Kuckelman, Koch Industries Inc, Wichita, KS, for Koch Agr. Inc.

Thomas G Ryan, Randall Pepetti, Lewis & Roca LLP, Phoenix, AZ, Michael Anthony Ceramella, Robert J McCully, Koch Industries Inc, Wichita, KS, for Koch Agr. Services.

Gerald Gaffaney, Scot L Claus, Mariscal Weeks McIntyre & Friedlander PA, Phoenix, AZ, for Wasatch Laboratories, Ltd.

## MEMORANDUM

WILLIAM G. YOUNG, District Judge.[1]

### I. *Introduction*

This blunderbuss civil action is, at bottom, a fairly straightforward claim for breach of contract. In *Southwest Pet Prods., Inc. v. Koch Indus., Inc.,* 89 F.Supp.2d 1115 (D.Ariz.2000) ("*Southwest I* "), this Court tried to cut the litigation sprawl down to size. Now, with trial looming, the principal remaining parties try for a knock-out blow via summary judgment.

Southwest Pet Products, Inc. ("Southwest") brings a Motion for Summary Judgment as to Count I (breach of contract), Count V (breach of express warranty), Count XIII (breach of implied warranty of merchantability), and Count XIV (breach of implied warranty of fitness). Southwest contends (1) that the contract was breached; (2) that the entire contract is found only on the front side of a certain written sales confirmation; (3) that the limitation of remedies on the reverse side is unconscionable in any event; and (4) that the remedies that are provided fail their essential purpose.

Defendants Koch Agriculture, Inc., Koch Agri Services, and Koch Industries, (collectively "Koch"), bring a cross Motion for Summary Judgment as to all counts as well. Koch argues (1) the contract is represented by both sides of the written sales confirmation; and (2)that even if the contract was breached, Southwest waived its remedies by failing to give timely notice of breach.

The cross motions for summary judgment were presented for argument on February 18, 2000.

### II. *Factual Background*

The undisputed facts relevant to these cross-motions are as follows. On or about April 7, 1995, Southwest contracted with Koch for the purchase of approximately 1400 tons of feed wheat. The purchase agreement was confirmed in a written sales confirmation (the "Confirmation") dated April 20, 1995. The front of the Confirmation outlined the basics of the verbal agreement while the reverse side contained the terms and conditions of the contract.

The terms and conditions, in large, bold print, expressly excluded implied warranties of merchantability and fitness for a

---

1. Of the District of Massachusetts, sitting by designation.

specific purpose. In addition, the terms and conditions excluded Koch from liability for any incidental or consequential damages. If the goods failed to conform to the contract, then Southwest was obliged to provide immediate notice. In the event of breach, the exclusive remedy available, at Koch's election, was either to replace the goods or to pay the buyer the difference between the contract price and the fair market value of the goods. The Confirmation allowed Southwest five days to disavow any conditions or terms. Southwest signed the Confirmation without comment and there is currently outstanding the sum of $134,000 paid by Southwest to Koch for the wheat.

In May 1995 Southwest received the shipment of feed wheat. As part of its normal procedure, Southwest took samples of the wheat from each railcar to test for the presence of vomitoxin, a naturally-occurring contaminant sometimes found in grain. Half of the sample was sent to Wasatch Laboratory and half was saved as a "library sample." The test results showed that the wheat was appropriate for use. Based on these results, Southwest processed the wheat into dog food and sent the finished product to Earth Elements, Inc. ("Earth Elements").

It wasn't long before Earth Elements received complaints from consumers that their dogs had become ill from eating the dog food. As a result, Southwest retested the wheat received from Koch and, according to Southwest, found that the level of vomitoxin exceeded acceptable limits. It immediately notified Koch about the problem. In addition, it rejected all subsequent shipments of wheat from Koch.

The dogfight that ensued involved much finger pointing, denials, and motions. This Court, after carefully separating the wheat from the chaff, dismissed Southwest's tort claims. *See Southwest I,* 89 F.Supp.2d at 1126, 1129–30. The only issues remaining, the contract claims, are the subject of these cross-motions for summary judgment.

## III. *Discussion*

### A. *Summary Judgment Standard*

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine" issue is one that "properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "material" fact is one that "might affect the outcome of the suit" under the applicable legal standard. *Id.* at 248, 106 S.Ct. 2505.

### B. *Defining the Contract*

As a threshold matter this Court must address Southwest's request that it "reevaluate" its earlier ruling that the contract between the parties "is governed by *both* sides of the Confirmation." *See Southwest I,* 89 F.Supp.2d at 1121. Southwest first argues that Southwest and Koch entered into an oral contract for the delivery of feed wheat. The front side of the Confirmation accurately memorializes the content of the verbal agreement. The reverse side—what Southwest calls the "Responsibility Evasion Terms"—however, represent additional terms that were neither discussed nor agreed upon. Therefore, according to Southwest, the contract does not include the reverse side of the Confirmation.

At the outset it must be noted that Southwest does not suggest that the reverse side of the Confirmation contains terms that *conflict* with the oral agreement reached by the two parties. It is Southwest's contention that the reverse side of the contract contains *additional* terms that it never negotiated. The Uni-

form Commercial Code, as adopted by Arizona, contains a provision that directly addresses this issue. *See* Ariz.Rev.Stat. § 47–2207 (1999).[2] Section 47–2207(A) provides:

a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

*Id.* Moreover, between merchants the additional terms become part of the contract unless:

1. The offer expressly limits acceptance to terms of the offer;

2. They materially alter it; or

3. Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Ariz.Rev.Stat. § 47–2207(B) (1999).

As a result, Southwest cannot simply evade the additional terms by pointing to the verbal agreement reached by Gene Moyes ("Moyes") and John Evans ("Evans"). It must offer some other evidence that the additional terms are not part of the contract. Southwest does not assert that its offer limited acceptance to the terms of the offer nor is there any evidence that, prior to litigation, Southwest notified Koch of its objection to the additional terms.

Further, Southwest does not *directly* contend that the additional terms materially alter the oral contract. This argument does enter the case, however, albeit

through the back door. A clause that materially alters a contract is one that results in unfair surprise or hardship. *See* Ariz.Rev.Stat. § 47–2207 cmt. 4 (1999). Not surprisingly, unfair surprise is also indicative of unconscionability. *See Maxwell v. Fidelity Fin. Servs.*, 184 Ariz. 82, 89, 907 P.2d 51 (1995).[3] Thus, if a clause is held to be unconscionable due to unfair surprise it may also constitute a material alteration of the contract. As a result, this Court will examine the additional terms through the lens of unconscionability.[4]

### C. *Reasonable Expectations*

■ Before examining unconscionability, this Court will examine Southwest's argument that the "reasonable expectations rule" requires the additional terms be excluded. Relying on *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 682 P.2d 388 (1984), Southwest contends that, because there is no evidence that the additional terms fell within the reasonable expectations of the parties, the terms may not be included in the contract. According to Southwest, the evidence supports an inference that based on prior transactions and prevailing trade practices, Koch had reason to believe the terms would not be acceptable. *See* Pl.'s Mem. at 6–7.

This argument is meritless and fails on several fronts. First, the Arizona Supreme Court stated in *Maxwell* that " 'reasonable expectations' . . . is more correctly associated with contracts of adhesion." 184 Ariz. at 87, 907 P.2d 51. The Arizona

---

**2.** Indeed, the Code drafters had just this scenario in mind when they created this provision.

This section is intended to deal with two typical situations. The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far agreed upon and adding terms not discussed.

Ariz.Rev.Stat. § 47–2207 cmt. 1 (1999).

**3.** Procedural unconscionability is concerned with "unfair surprise" while substantive unconscionability concerns the actual terms. Contract terms that are "so one-sided as to oppress or unfairly surprise an innocent party" are indicative of substantive unconscionability. *Maxwell*, 184 Ariz. at 89, 907 P.2d 51.

**4.** This is the more prudent move since Arizona law on unconscionability is slightly more developed than the concept embodied in Ariz. Rev.Stat. § 47–2207(B)(2).

Supreme Court has defined an adhesion contract as:

> a standardized form "offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form of contract."

*Broemmer v. Abortion Servs. of Phoenix, Ltd.,* 173 Ariz. 148, 150, 840 P.2d 1013 (1992) (quoting *Wheeler v. St. Joseph Hosp.,* 63 Cal.App.3d 345, 356, 133 Cal. Rptr. 775 [1976] ). The plaintiff in *Broemmer,* as a prerequisite to medical treatment, had to sign a contract that waived her right to access to the court system. *See id.* at 151, 840 P.2d 1013. Given this backdrop, Southwest offers no evidence, and cannot seriously suggest, that the Confirmation was an adhesion contract.

Moreover, *Darner* involved conflicting oral representations and contract terms in an insurance policy. *See* 140 Ariz. at 385, 682 P.2d 388. The Arizona Supreme Court granted review because it "believe[d] that the issues presented call[ed] into question the clarity and consistency of a large body of Arizona law dealing with insurance coverage." *Id.* Admittedly, the language in *Darner* extends to all contracts, but it encompasses contracts between unsuspecting consumers in weak bargaining positions faced with daunting, standardized contracts from large companies in superior bargaining positions. *See id.* at 389, 682 P.2d 388; *see also Western Chance # 2, Inc. v. KFC Corp.,* 734 F.Supp. 1529, 1538–39 (D.Ariz.1990) (Marquez, J.) (declining to extend *Darner* to standardized contract terms between "sophisticated businessmen"), *aff'd in part, rev'd in part on other grounds,* 957 F.2d 1538 (9th Cir.1992).

The negotiations and resulting contract between Southwest and Koch can hardly be compared to an individual consumer's attempts to contract with an insurance company, car rental agency, or airline. *See Darner,* 140 Ariz. at 392 n. 8, 682 P.2d

388. It is undisputed that Moyes, Southwest's representative, is a knowledgeable businessperson with years of experience in purchasing raw materials. Further, there is no evidence that there was an inherent power differential in the relationship between Southwest and Koch. Southwest could have declined to accept the terms of the contract or negotiated different terms.

Moreover, contrary to Southwest's position, the rule adopted in *Darner* "charges the customer with knowledge that the contract being 'purchased' is or contains a form applied to a vast number of transactions and includes terms which are unknown (or even unknowable); it binds the customer to such terms." *Id.* at 393–94, 682 P.2d 388. More importantly, "[t]he rule does not set a premium on failure to read." *Id.* at 394, 682 P.2d 388. The reasonable expectations rule does not relieve Southwest of its failure closely to examine the Confirmation prior to signing it. Like the court in *Western Chance,* this Court declines to extend the protections offered the individual consumer in *Darner* to the commercial setting.

### D. *Unconscionability*

■ This Court, when it earlier denied Koch's motions to dismiss, stated:

> Given the rather standard nature of the warranty and remedy limitations at issue in this case, and given the highly sophisticated nature of Southwest and Earth Elements, it is extremely doubtful that Southwest will be able to show that the Confirmation is unconscionable as matter of law. The challenged clauses in the instant litigation are near-universal terms applied in the dog-eat-dog world of commerce.

*Southwest I,* 89 F.Supp.2d at 1122. Nevertheless, Arizona law requires that the parties be allowed to present evidence of unconscionability. *See* Ariz.Rev.Stat. § 47–2302 (1999). To that end, both Koch and Southwest have moved for summary judgment on this issue.

Recognizing the "somewhat circular articulation" of the unconscionability doc-

trine, the Arizona Supreme Court more clearly defined the test for unconscionability in *Maxwell.* *See* 184 Ariz. at 88, 907 P.2d 51. The framework consists of two parts—substantive unconscionability and procedural unconscionability. *See id.*

Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. *See id.* at 89, 907 P.2d 51 (citing *Resource Management Co. v. Weston Ranch and Livestock Co.,* 706 P.2d 1028, 1041 [Utah 1985]). Procedural or process unconscionability is concerned with unfair surprise. Under the procedural rubric, courts examine factors influencing the bargaining process: "the real and voluntary meeting of the minds of the contracting party: age, education, intelligence, business acumen and experience, relative bargaining power ... [and] whether there were alternative sources of supply of the goods in question." *Id.* (quoting *Johnson v. Mobil Oil Corp.,* 415 F.Supp. 264, 268 [E.D.Mich.1976]).

In addition to defining the terms, the *Maxwell* court concluded that a claim of unconscionability under the U.C.C. can be established with a showing of substantive unconscionability alone, "especially in cases involving ... limitations of remedies." *Id.* at 90, 907 P.2d 51. The court concluded that if only procedural irregularities are present, it is more appropriate to analyze the claims under the doctrines of fraud, misrepresentation, and mistake. *See Maxwell,* 184 Ariz. at 90, 907 P.2d 51 (citing *Resource Management Co.,* 706 P.2d at 1043). The court declined to decide the remedy for procedural unconscionability alone. *See id.*

### 1. *Substantive Unconscionability*

To support its motion for summary judgment, Southwest argues that when Koch provided defective wheat with a concomitant inflated profit margin from areas known to contain excessive levels of vomitoxin yet simultaneously limited the available remedies, its conduct was substantively unconscionable. *See* Pl.'s Mem. at 13.[5] Koch contends that the terms and conditions in the Confirmation are standard in the industry and identical to terms contained in similar contracts that Southwest signed and continues to sign with other vendors. *See* Defs.' Mem. at 9.

Substantive unconscionability must be determined at the time of contracting. *See Seekings v. Jimmy GMC of Tucson, Inc.,* 130 Ariz. 596, 602, 638 P.2d 210 (1981); *Resource Management,* 706 P.2d at 1043. To judge the substantive fairness of a contract at a subsequent date would "nullify many contracts entailing a speculative element." *Resource Management,* 706 P.2d at 1043. Thus, the Court must focus on the commercial setting at the time the parties entered into the contract. Moreover, substantive unconscionability focuses on the *terms* of the contract and seeks to determine whether they are "so one-sided as to oppress or unfairly surprise an innocent party." *Maxwell,* 184 Ariz. at 90, 907 P.2d 51.

In view of this analytical framework, Southwest's argument misses the mark. Southwest contends that Koch had superior knowledge at the time of contract formation and based on this knowledge obtained a limitation of remedies.[6] As-

---

**5.** At oral argument Southwest also cited two cases to bolster its claim of unconscionability. Unfortunately, neither helps its cause. *MRO Communications, Inc. v. American Tel. & Tel., Co.,* No. 98–16716, 1999 WL 1178964 (9th Cir. Dec.13, 1999) was decided under New Jersey law and the Ninth Circuit held that the warranty disclaimers were not unconscionable. Nothing in the language of the case supports Southwest's position. *S.M. Wilson & Co. v. Smith Int'l, Inc.,* 587 F.2d 1363 (9th Cir.1978) was decided under California law and provides no help to Southwest. There

the Ninth Circuit determined that even though the seller was unable to cure the defect it "[was] not enough to require that the seller absorb losses the buyer plainly agreed to bear." *Id.* at 1375.

**6.** Southwest also argues that Koch made a significant profit on the wheat. There is evidence that Koch bought the wheat at a reduced price. Southwest then suggests that this cost-price disparity is evidence of substantive unconscionability. Once again, Southwest attempts to fit a round peg into a

suming *arguendo* that Koch did have knowledge that the wheat purchased contained excessive vomitoxin, this fact does not support a finding of substantive unconscionability. There is no evidence in the record that the terms offered by Koch at the time the contract was entered were different as a result of that knowledge. *See Seekings,* 130 Ariz. at 602, 638 P.2d 210 (finding that superior bargaining position was not used to oppress or surprise because contract was no different from those used in all sales).

More importantly, it appears that the terms were standard in the industry. Southwest admits that prior to this contract, it had signed another confirmation with Koch that contained identical terms. *See* Pl.'s Mem. at 12. Further, despite Southwest's contention that the limitations are "draconian," there is evidence that Southwest signed, and continues to sign, contracts with other vendors with similar or identical disclaimers. *See* Defs.' Statement of Facts ¶ 24; Moyes Dep. 20–24. While Southwest may have been ignorant of the disclaimers, failure to read does not support a finding of substantive unconscionability. *See Salt River Project Agric. Improvement and Power Dist. v. Westinghouse Elec. Corp.,* 143 Ariz. 368, 385, 694 P.2d 198 (1984) (en banc) ("*Salt River II* ") (recognizing that purchaser may waive remedies even though it is uninformed as to what it is waiving). To hold otherwise would be to undermine the freedom of contract and the free flow of goods in society. *See Angus Medical Co. v. Digital Equip. Corp.,* 173 Ariz. 159, 167, 840 P.2d 1024 (Ct.App.1992). Standardized contracts are a reality of today's business arena and a necessary component of the fast-paced world of commerce. It is not the place of the judicial system to rewrite contract terms for sophisticated business

entities caught unaware by unfavorable provisions that they failed to read and negotiate. "Evidence showing that one party failed to negotiate a better deal than that actually achieved does not ... establish that the agreement of the parties was unconscionable." *Salt River Project Agric. Improvement and Power Dist. v. Westinghouse Elec. Corp.,* 143 Ariz. 437, 447, 694 P.2d 267 (Ct.App.1983) ("*Salt River I* "), *approved in part, vacated in part on other grounds,* 143 Ariz. 368, 694 P.2d 198 (1984).

### 2. *Procedural Unconscionability*

■ Southwest also asserts that the procedural defects in the bargaining process preclude enforcement of the contract. According to Southwest, Koch's superior knowledge regarding the likely presence of vomitoxin in spring wheat acquired from North Dakota and Minnesota placed it in a superior position to bargain the allocation of the risk of loss. *See* Pl.'s Mem. at 10; Evans Dep. at 32:5–20. In contrast, Koch argues that Southwest is a sophisticated business entity, with bargaining power equal to that of Koch, that was able to alter the terms of the contract but failed to do so. Thus, according to Koch, Southwest cannot now claim it was "hoodwinked" into executing the contract. *See* Defs.' Mem. at 11.

When the record is reviewed as a whole, Southwest's argument rings hollow. Both parties were aware of the possible presence of vomitoxin in the wheat. *See* Morrison Decl.; Evans Dep. at 32:5–10. Southwest, upon delivery of any wheat, inspects the shipments, obtains samples of the wheat and tests the wheat for the presence of vomitoxin. *See* Morrison Decl. ¶¶ 3–5. In this case, a sample of the

---

square hole. In *Maxwell* the cost-price disparity reflected how much the *consumer* paid for the product. The plaintiff in *Maxwell* bought a $6,500 water heater at 19.5% interest, paid $14,860.43 and was required to sign a contract that allowed foreclosure on her home for non-payment. The court found this "grossly-excessive" price unconscionable.

This is not the case here. Southwest does not suggest that the price charged was excessive, only that Koch made an excessive profit. While the price paid by Koch may lend credence to Southwest's contention that Koch knew or should have known of the "defect" in the wheat, it does not offer support for substantive unconscionability.

wheat was taken from each railcar; half was sent to Wasatch Laboratory and half was stored as a "library sample." *See id.* ¶ 5. The test results showed vomitoxin "less than 1 ppm," well below the 5 ppm considered toxic.

Even if this Court were to take the allegations against Koch as true, there is no evidence that such knowledge affected the bargaining process. The breakdown in the process did not occur at the negotiation stage but at the testing stage. Southwest did not use the wheat based on any misrepresentations by Koch that the wheat was free of vomitoxin, it used the wheat based on the testing results from the Wasatch Laboratory.

Moreover, the bargaining power between the two parties was not skewed. *See Maxwell,* 184 Ariz. at 89, 907 P.2d 51. Koch was not the "only game in town." *See Salt I,* 143 Ariz. at 446, 694 P.2d 267. There is evidence that Southwest purchases raw materials from a variety of vendors. Moreover, Moyes, Southwest's representative, is a seasoned purchaser with years of experience. There is nothing in the record to suggest "bargaining naughtiness." *Maxwell,* 184 Ariz. at 89, 907 P.2d 51.

### E. *Do the Remedies Fail Their Essential Purpose?*

■ In an effort to obtain remedies not available under the contract, Southwest argues that the remedies allotted fail their essential purpose. Limited remedies under the Uniform Commercial Code that fail their essential purpose will not be enforced. *See* Ariz.Rev.Stat. § 47–2719(B) (1999). The Confirmation establishes that if the goods fail to conform to the contract specifications, Koch

> may at it's [sic] election, either replace the goods with conforming goods within a reasonable time, or, pay to the Buyer the difference between the contract price and the fair market value of the goods delivered.

Southwest raised this argument at the dismissal stage and this Court summarily dis-

missed it. Now, at the summary judgment stage, Southwest again asserts that the remedies fail their essential purpose but offers neither new legal arguments nor any compelling evidence. It cites the same cases and arguments that this Court reviewed and distinguished in *Southwest I.*

Southwest's attempts to obtain relief other than the remedies available in the contract are unavailing. It has been established by this Court that Southwest signed a contract that limited its remedies. Upon receipt of the wheat, Southwest tested it and found it to be conforming. Based on its own tests, it processed the wheat into dog food and forwarded the finished product to Earth Elements. Later, it was determined that the testing results were inaccurate. Southwest cannot now hold Koch liable for the deficiencies in its own testing process. As this Court noted, "[t]he fact that the Confirmation contained a provision limiting Southwest's remedy to replacement or refund merely represents an allocation of the risk of a latent defect." *Southwest I,* 89 F.Supp.2d at 1122–23.

This ruling is wholly supported by the case cited by Southwest during its most recent oral argument, *S.M. Wilson & Co. v. Smith Int'l, Inc.,* 587 F.2d 1363, 1375 (9th Cir.1978). There the court held that the failure of a limited repair remedy to serve its purpose did not permit recovery of consequential damages. *See id.* The court was unwilling to shift the risks as allocated by parties of equal bargaining power. *See id.* "Risk shifting is socially expensive and should not be undertaken in the absence of a good reason. An even better reason is required when to so shift is contrary to a contract freely negotiated." *Id.*

Moreover, Southwest fails to appreciate the difference between a remedy that fails its essential purpose and a remedy that fails to compensate for all losses associated with a breach. An example of the former is a remedy that provides for the repair or replacement of defective parts. *See Kalil*

*Bottling Co. v. Burroughs Corp.*, 127 Ariz. 278, 282, 619 P.2d 1055 (1980); *Roberts v. Morgensen Motors*, 135 Ariz. 162, 166–67, 659 P.2d 1307 (App.Ct.1992). Implicit in the terms of the contract is the presumption that the defect can be cured by replacement or repair. *See Kalil Bottling*, 127 Ariz. at 282, 619 P.2d 1055. If this presumption fails, either because the product is so deficient it cannot be fixed or the warrantor fails to replace or repair the part, the remedy has failed. *See Roberts*, 135 Ariz. at 166–67, 659 P.2d 1307 (noting remedy failed because even after numerous attempts to repair, the car still did not work). Even in these instances, however, the breaching party is not obligated to pay for all the losses associated with the breach. *See S.M. Wilson*, 587 F.2d at 1375.

The facts of this case represent an example of the latter. The defect could have been cured by replacement or refund. The defective wheat could be replaced with new wheat or Southwest could receive a refund and replace the wheat from a different vendor. The remedy did not fail its essential purpose. Southwest explicitly waived the remedies it now seeks when it signed the Confirmation.

Southwest further contends the remedies fail their essential purpose because Koch failed to tender a remedy. Specifically, that "[d]espite numerous written demands on Koch for reimbursement, indemnification, contribution and defense out of Koch's provision of contaminated wheat ... Koch has failed and refused to indemnify Southwest for any loss resulting from the recall and its settlement agreement with [Earth Elements]." Pl.'s Mem. at 15. Koch has no legal obligation of indemnification, however. That argument rested on the shaky foundation that the limitation of remedies were not a part of the contract. This Court has ruled they are and, as such, the remedies did not fail their essential purpose.

## IV. *Conclusion*

As matter of law, there is no evidence to support a finding of substantive or procedural unconscionability and, by default, there is no evidence to suggest that the additional terms materially altered the contract. Consequently, the contract includes the limitations on liabilities contained on the reverse side of the Confirmation. In addition, the remedies provided do not fail their essential purpose. For these reasons, the Court, from the bench, denied Southwest's motion for summary judgment as to Count XIII and Count XIV, and granted Koch's motion for summary judgment as to these counts.

## V. *Present Procedural Posture*

Once the Court made the ruling noted immediately above, it was apparent to all parties that the maximum recovery available to Southwest on the contract was $134,000 plus statutory interest from the date of the breach. At this juncture, at the urging of the Court, Koch (which had earlier offered $180,000 in settlement of all claims) orally represented that it would file a written offer of judgment pursuant to Fed.R.Civ.P. 68 and tender payment in the sum of $180,000. This moots the remaining disputed factual issues without the necessity of ruling further on Koch's cross motion for summary judgment.

Accordingly, this Court ordered judgment to enter for Southwest in the amount of $180,000 upon the filing of a written offer of judgment, without finally determining the factual merits of Southwest's claim. Finally, on February 24, 2000, the Court entered a procedural order pursuant to Local Rule 2.20 to govern the determination of any possible claims for attorney's fees.