F I L E D
United States Court of Appeals
Tenth Circuit

JUL 13 2001

PATRICK FISHER
Clerk

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

NATIONAL ENVIRONMENTAL SERVICE
COMPANY, an Oklahoma corporation,

    Plaintiff-Appellant,

v.

RONAN ENGINEERING COMPANY, a foreign
corporation,

    Defendant-Appellee,

and

MOTOROLA, INC., a Delaware corporation,

    Defendant.

No. 99-5206

---

Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 97-CV-860-H)

---

Joe M. Fears (Robert J. Bartz with him on the briefs) of Barber & Bartz, P.C.,
Tulsa, Oklahoma, for Plaintiff-Appellant.

Craig W. Hoster (Alexander F. King with him on the brief) of Crowe & Dunlevy,
Tulsa, Oklahoma, for Defendant-Appellee.

---

Before **SEYMOUR** and **McWILLIAMS**, Circuit Judges, and **BELOT**,[*] District Judge.

_____

**SEYMOUR**, Circuit Judge.

_____

National Environmental Service Company (NESCO) sued Ronan Engineering for negligence and breach of contract after Ronan failed to deliver a leak detection system for underground fuel storage tanks. The jury found no contract had been breached, and determined that while both parties had been negligent in their dealings, NESCO's negligence outweighed that of Ronan. NESCO appeals, contending the district court erred in its rulings on two evidentiary matters and one jury instruction. We affirm.

# I

# BACKGROUND

*Project Negotiations*

NESCO is an Oklahoma corporation which acts as a general contractor for a variety of projects involving the installation and service of fuel systems. In 1994, it contracted with Tinker Air Force Base to upgrade Tinker's fueling

_____

[*] The Honorable Monti L. Belot, United States District Judge, United States District Court for the District of Kansas, sitting by designation.

equipment, remove outdated underground fuel tanks and install new ones, and install leak detection systems on the tanks. Ronan was brought in as a subcontractor to design and install the leak detection systems.

Traditionally, leak detection systems in underground fuel tanks work via telephone lines. Probes are installed in each fuel tank in order to measure fluid level and other essential data, and a master computer "phones" the probes at pre-programmed times to collect the data and monitor the condition of the tanks. For this project, however, Tinker asked NESCO to explore the feasibility of using radio-based communication in place of the traditional telephone linkage. The NESCO representative responded that he would have to confer with Ronan. When representatives from Ronan, NESCO, and Tinker eventually met to discuss the feasibility of radio communications, the Ronan representative, sales manager Mike Thornton, stated that he thought radio monitoring would be possible and agreed to research the issue.

Mr. Thornton began discussions with Motorola, a well-known manufacturer of radio systems, in order to discern whether Motorola radio products might be suitable for the Tinker project. He requested a price quotation that he might use in preparing a budget for the Tinker plan, and a Motorola sales manager faxed him a price for equipment and installation of the leak detection systems utilizing a radio model called Darcom. A message on the fax cover sheet

included a caveat that "[d]ue to [Ronan's] time frame only a cursory view has been taken in preparing this budgetary quote." App., vol. IV, at 704.

In February 1995, Mr. Thornton sent NESCO a projected price for the Darcom radio system. The quote included charges for equipment and installation, and it specified that the project would be completed between four and six weeks after receipt of the project order. The letter also included the following statements:

> The following quote is only a cursory view for budgetary purposes and the final components and costs are subject to change dependent on actual site conditions. This equipment is dependent on line-of-site [sic] [radio frequency] paths from each remote and each master site. This equipment proposes to use frequencies between 928-952 mhz and it will be the users [sic] responsibility to obtain authorized frequencies and to acquire approval from the Base LMR office.

*Id.* at 742. The NESCO representative, Charles Nance, did not ask Mr. Thornton about the "cursory view" language. Instead, he testified that he understood this language to mean the price was firm unless later modifications were required due to frequency changes or line-of-sight problems. Mr. Nance orally notified a Tinker official of the quote.

The parties then waited several months for Tinker's decision. In fall 1995, Tinker notified NESCO that it would need a firm price based on a specified frequency. Mr. Nance phoned Mr. Thornton to request the price, following up with a fax that read in part:

> Tinker AFB is still wanting to look at operating the Ronan Tank Monitor's [sic] via a radio frequency instead of telephone lines or [cellular] service. Please work me up a **FIRM** price using frequency 142.6750, detailing everything that will be included and every thing that NESCO will need to furnish or do. Everything is still the same as before . . . .

*Id.* at 709 (emphasis in original). Mr. Thornton called Motorola for a final quote, only to learn that the Darcom radios would not work on the given frequency. Finding a frequency that could work with the Darcom system would take many months. After further research, the Motorola representative suggested a model called R-Net to replace the Darcom system.

Motorola sent Ronan the R-Net quote in late November, adding "I hope this will let you complete your project. All of this is dependent on the clearance of this project through the Base LMR office on Tinker." *Id.* at 710. Ronan added its standard markup and installation fees and forwarded the quote to NESCO, giving an estimated completion time of three to four weeks after receipt of the project order. The Ronan quote included substantially the same language as was given in its earlier communications:

> The following quote is a cursory view for budgetary purposes and the final components and costs are subject to change dependent on actual site conditions. This equipment is dependent on line-of-site [sic] [radio frequency] paths from each remote and each master site. This equipment proposes to use frequency 142.6750 MHz and it will be the users [sic] responsibility to obtain approval from the Base LMR office for this frequency.

*Id.* at 712. It went on to say that the R-Net equipment was less sensitive to line-

of-sight problems than the earlier model, but that a clear line of sight would be preferable nonetheless. Mr. Nance testified that he recognized the "cursory view" language from Ronan's earlier quote and again understood it to mean that later system modifications might lead to changes in price. He explained that he paid little attention to continued use of the disclaimer because he had requested a firm price and because on this occasion Ronan had sufficient time to give the project more than "cursory" consideration.

NESCO submitted its final project proposal to Tinker in January 1996. The leak detection portion of that proposal was based on the equipment and installation costs from Ronan's quote and included Ronan's qualifications regarding frequency changes and line-of-sight problems. Mr. Thornton testified that he knew NESCO would use the Ronan quote in making its own proposal to Tinker, as this was standard practice in the industry. Tinker changed the proposed radio frequency in early February, but the change had no effect upon the proposed project price. Ronan and NESCO simply issued new quotes that were identical to the old except for the frequency alteration.

In March 1996, as the two companies awaited a final decision by Tinker, Mike Thornton contacted Charles Nance to request a purchase order for the radio project so that Ronan could include the project in its first fiscal quarter sales. Mr. Nance executed a purchase order referencing the agreed-upon equipment and

faxed the purchase order to Ronan. Since the project still had not received final approval from Tinker, however, he warned that the order was "pending upon approval in writing from the Tulsa District Corps of Engineers" and added, "[p]lease do not send any invoices until material has been received." *Id.* at 718.

NESCO and Tinker finalized their negotiations on April 9, 1996. In order to expedite receipt of the radio equipment, a Tinker official provided written approval for NESCO to execute its purchase order with Ronan. The Tinker letter reflected an expected completion date of June 26, 1996, which was calculated by adding together six weeks to order and receive the equipment and the three to four weeks that Ronan had estimated would be required for installation. Mr. Nance faxed the approval notice to Ronan on April 16 and requested that the equipment purchase order be executed immediately. He did not mention the expected completion date.

### *Completion Problems*

After telling Ronan to execute the purchase order, NESCO began to await receipt of the radio equipment. Mr. Nance heard nothing from Ronan until May 10, when he received a letter from Mr. Thornton stating Ronan had just learned from Motorola that reaching the required frequency required the growth of "custom crystals" for the radios, a process that would take six to eight weeks.

Ronan requested test radios from Motorola so that project testing could proceed, but for radios with the correct frequency there was no choice but to await the crystals. This would put project completion at least two weeks past the previously specified date of June 26, but Tinker reluctantly agreed to wait. On May 20, Mr. Thornton informed NESCO that the equipment manufacturing process would take another eleven weeks and the radios were now due to arrive in mid-August.

Unbeknownst to NESCO, Mr. Thornton's new supervisor at Ronan began to doubt the feasibility of the proposed radio communications. Razmik Haftvani, the new head of Ronan's Leak Detection Division, contacted Motorola in early May for detailed information about the R-Net specifications. On learning the full facts, Mr. Haftvani had "reservations" that the project would work as specified. These reservations were not communicated to NESCO, which received and signed the final Tinker contracts in July. All portions of the project not involving Ronan were complete by this point, and NESCO left the job site to await action by Ronan.

Back at Ronan, Mr. Haftvani received the test radios on July 25. He immediately realized they would not work for their assigned function. The master leak detection computer was designed to call each tank sequentially to poll its data, and because the radios worked on the same frequency, they would all answer

a radio call simultaneously. Mr. Haftvani contacted Motorola to complain that the radios would not support sequential polling—the Motorola representative agreed, explaining that Ronan had never told him sequential polling would be necessary. The Tinker project would work as planned only if Ronan purchased expensive software to modify the R-Net radios or switched to a different radio model called MOSCAD, which would support the polling function.

Mr. Nance contacted Ronan around August 1 and was told there were problems with the radio system but that Ronan was working on the problems. He relayed this information to Tinker. Mr. Thornton wrote to Mr. Nance on August 8 to explain the R-Net polling problem. He stated that the only two options would be to obtain thirty-four different frequencies (one for each underground tank), an unwieldy solution, or switch to MOSCAD radios, which cost about three times more than the R-Net model. NESCO had signed a formal contract with Tinker for the radio modifications on August 9. It notified Tinker of the polling problems on August 19.

Over the next few weeks, Tinker put increasing pressure upon NESCO to find a solution to the radio problems. The project was now over two months past its expected completion date of June 26, and the contract provided liquidated damages for every day by which project completion exceeded this date. NESCO and Ronan continued to negotiate a solution throughout the fall of 1996, but

NESCO eventually hired a different engineering company to complete the project. In the end, the project cost much more than originally anticipated and NESCO suffered significant financial losses.

### *This Lawsuit*

NESCO filed this action against Ronan, alleging breach of contract for Ronan's failure to complete the leak detection project and seeking restitution for NESCO's financial loss. Alternatively, NESCO alleged Ronan was negligent in the course of their dealings. Ronan denied the existence of a contract and raised several affirmative defenses. Ronan also countersued, alleging NESCO was itself negligent during contract negotiations. Several months later, NESCO added Motorola as a codefendant, alleging breach of contract and negligent misrepresentation in Motorola's failure to deliver appropriate radio systems. Motorola and Ronan then cross-claimed against one another.

The district court granted Motorola's pretrial motion to dismiss on NESCO's contract claim. At the close of discovery, the court granted Motorola's motion to dismiss on NESCO's negligence claim as well. The court also dismissed Ronan's cross-claims against Motorola a few weeks before trial, thus removing Motorola from the case entirely. The lawsuit proceeded to a jury trial in the district court. The jury returned two special verdicts, finding first that

Ronan had not breached a contract with NESCO and, second, that NESCO was sixty percent negligent and Ronan forty percent negligent. Because NESCO's negligence liability outweighed that of Ronan, NESCO recovered no damages from the suit. NESCO's motion for a new trial was denied.

On appeal, NESCO raises the same arguments presented in its motion for a new trial. It contends the district court erred in allowing a Ronan employee to testify regarding Ronan's internal policy against entering into binding contracts for nonstandard jobs. It also argues the court should have instructed the jury that a contract may be formed despite the unexpressed reservations of one party. Finally, NESCO contends the court erred in allowing evidence of NESCO's claims against Motorola. We address each argument in turn.

## II

## RONAN INTERNAL POLICY

Before trial, NESCO filed a motion in limine objecting to planned testimony by Razmik Haftvani, Ronan's director of engineering and manager of the leak detection division, regarding Ronan's alleged internal policy under which it did not enter into binding contracts on "nonstandard" jobs without first obtaining approval from its engineering department. NESCO argued the internal policy was irrelevant to whether a contract was formed because the Uniform

Commercial Code (UCC), as adopted in Oklahoma, allows only objective evidence of a party's intent to form a contract. Because the internal policy was never communicated to NESCO, the policy was indicative of subjective, not objective, intent. *See* App., vol. I, at 63-64. NESCO further objected that Mr. Haftvani was not an appropriate party to testify about contract negotiations because he was not personally a part of the negotiation process. *Id*. at 62. The objections were addressed at a pre-trial conference, whose proceedings are not reproduced in the record.

At the end of the third day of trial, Ronan requested the court to revisit the issues raised in NESCO's motion in limine. Ronan argued the evidence already presented had laid sufficient foundation for allowing testimony about the internal policy. NESCO continued to object that unexpressed reservations are irrelevant to contract formation under the UCC. The court took the question under advisement overnight. *See* App., vol. III, at 559-60. The next morning, the court ruled that Mr. Haftvani's testimony regarding Ronan's normal business practice would be allowed. Mr. Haftvani testified regarding the Ronan policy, and NESCO appeals the admission of his testimony.

We generally review a district court's determination regarding admission of evidence for abuse of discretion. *Boughton v. Cotter Corp.*, 65 F.3d 823, 832 (10th Cir. 1995). If the complaining party failed to make a contemporaneous

objection at trial, however, we review the ruling under a plain error standard. *Pandit v. Am. Honda Motor Co., Inc.*, 82 F.3d 376, 379 (10th Cir. 1996); Fed. R. Evid. 103(d). Ronan contends NESCO's objections to Mr. Haftvani's testimony should be reviewed only for plain error because NESCO did not object at the time of the testimony. We have delineated a three-part test for whether a party must object at the time of trial in order to renew objections made in an earlier motion in limine: "To overcome the claim of waiver for failure to contemporaneously object, we must satisfy ourselves that (1) the matter was adequately presented to the district court; (2) the issue was of a type that can be finally decided prior to trial; and (3) the court's ruling was definitive." *Pandit*, 82 F.2d at 380.

Here, the issues were adequately presented to the district court in NESCO's initial motion in limine as well as the arguments presented to the court directly preceding Mr. Haftvani's testimony. Although Mr. Haftvani had not yet testified, it was understood he would testify that Ronan had an internal policy against entering binding contracts on nonstandard jobs without express approval from its engineering department. The district court's ruling did not depend on the actual explanation given by Mr. Haftvani in his testimony; rather, it was a determination whether the testimony should be allowed at all. As such, it was of a type that could be decided prior to trial. Moreover, the court's ruling was definitive, stating Ronan would be allowed to present the challenged testimony and NESCO

-13-

could cross-examine thereafter. *See* App., vol. III, at 566. Considering in particular that the issue was revisited directly before the challenged testimony was offered, there was no need for NESCO to renew its objections at the moment the testimony was offered. Consequently, we review this evidentiary issue for abuse of discretion rather than plain error.

One of the central questions in this case is whether the communications between Ronan and NESCO were sufficient to constitute a binding contract, or were instead mere negotiations over a possibility of contracting with one another. If no contract was formed, Ronan bore no responsibility to furnish NESCO with the leak detection system. The law does not recognize a contract unless both parties showed a "meeting of the minds" in their intent to form one. Traditionally, at common law as well as in Oklahoma statutory law, this intent was measured subjectively; consent to form the contract was "not mutual unless the parties all agree[d] upon the same thing in the same sense." *Bradford v. Plains Cotton Coop. Assoc.*, 539 F.2d 1249, 1253 (10th Cir. 1976) (quoting pre-UCC Oklahoma statute, OKLA. STAT. tit. 15, § 66 (1910)).[1]

_____

[1] Even under the traditional regime, however, this subjective intent had to be measured in some observable form. Thus, as Judge Learned Hand explained a half-century before Oklahoma adopted the UCC:

A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached

(continued...)

-14-

Oklahoma adopted the UCC in 1961, joining a national scheme to replace the varying laws of each state with a set of rules that are uniform among the states. This case is controlled by the post-UCC version of Oklahoma contract law, which provides:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

OKLA. STAT. tit. 12A, § 2-204 (1991). The reliance upon "conduct by both parties which recognizes the existence of . . . a contract" suggests an increased emphasis on objective, observable manifestations of intent to contract. Thus, we have held that the statute "rejects the more subjective test of intent" to focus entirely upon

---

[1](...continued)
by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. . . . Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

*Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911).

objective behavior, asking whether there was "mutuality of assent as manifested by the conduct of the parties." *Bradford*, 539 F.2d at 1253 (construing Oklahoma UCC statute); *see also Cargill, Inc. v. Stafford*, 553 F.2d 1222, 1224 (10th Cir. 1977) (same conclusion under Colorado UCC statute).

NESCO argues Ronan's testimony about its internal policy against entering into binding contracts on nonstandard jobs was offered as evidence that Ronan representatives could not have intended to contract with NESCO during the course of their negotiations. NESCO contends the policy was irrelevant because it was never communicated to NESCO. Under the current UCC standard, only words and actions actually shared with the other party may be considered as evidence of intent. Intent must be determined based solely on a reasonable interpretation of the written and oral communications between the two companies, without regard to any unexpressed reservations. *See generally United States v. Commercial Mech'l Contractors, Inc.*, 707 F.2d 1124, 1127 (10th Cir. 1982) (both oral and written communications can form basis for contract).

NESCO is correct in asserting that, under the UCC, it is inappropriate to allow testimony regarding one party's unexpressed subjective reservations as evidence that a contract was never formed. The district court did not allow the testimony for that purpose, however. As the court explained in its denial of NESCO's motion for new trial:

> [A]t trial, NESCO asserted that Ronan's use of the language "cursory view for budgetary purposes" was lifted directly from similar language in a quote by Motorola to Ronan and did not reflect Ronan's reservations about entering a non-standard contract. The Court determined that this assertion provided a sufficient evidentiary basis for introduction of Ronan's internal policy regarding non-standard contracts and therefore admitted testimony regarding Ronan's internal policy.

App., vol. I, at 209. Thus, the testimony was allowed to rebut other evidence offered by NESCO purporting to explain the meaning of the "cursory view" language, itself a valid objective manifestation of intent not to contract.

If the law requires objective manifestations of a party's intent, as we have just explained it does, these objective signs must be interpreted as they appear to a reasonable observer under the circumstances. No negotiations exist in a vacuum, and the circumstances of the parties' communications can be essential for determining a reasonable interpretation of a particular statement. At trial, testimony established that Ronan representatives mentioned during negotiations they would have to confer with Ronan's engineering department about the radio communications. *See, e.g.*, App., vol. III, at 450 (Mr. Thornton "would have to check with the engineers with Ronan" before proceeding). To that extent, the challenged testimony could be seen as an explanation of the reason for those actual communications with NESCO. Apparently this was the view taken by the district court. Viewing the evidence in that light, we are not persuaded the trial court abused its discretion in admitting Mr. Haftvani's testimony.

-17-

# III

## JURY INSTRUCTION ON INTENT

In a related issue, NESCO requested before trial that the jury be instructed as follows: "[i]f the words and actions of the parties demonstrate the existence of an agreement, then a contract exists, even though one of the parties may harbor unexpressed reservations or objections to the existence of that contract." App., vol. I, at 85. The cited legal authority was one case from the Missouri court of appeals and one from Arizona. *See Computer Network, Ltd. v. Purcell Tire & Rubber Co.*, 747 S.W.2d 669, 675 (Mo. App. 1988); *Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.*, 694 P.2d 267, 276 (Ariz. App.), *vacated in part*, 694 P.2d 198 (Ariz. 1984). Ronan objected that the requested instruction was not an accurate reflection of Oklahoma law. *See* App., vol. II, at 358. The court agreed the "proposed instruction had no basis in Oklahoma law," App., vol. I, at 211, and ultimately rejected it.

Because the UCC is intended to be applied uniformly across the various states, courts routinely turn to decisions from other states when there is no case law on point within the relevant jurisdiction. For example, in *Reynolds-Wilson Lumber Co. v. Peoples National Bank*, 699 P.2d 146 (Okla. 1985), the Oklahoma Supreme Court observed with disapproval that one party did "not attempt to distinguish [cases cited by the other], but instead simply brush[ed] them aside

because they were decided in other jurisdictions." 699 P.2d at 149. Similarly, that court held a lower court was "incorrect" in refusing to consider the other decisions in its rulings. *Id.* In contrast, the state supreme court considered the cases "persuasive . . . in the absence of any Oklahoma decisions on the point, and in view of the policy of the Oklahoma Uniform Commercial Code 'to make uniform the law among the various jurisdictions.'" *Id.* (quoting OKLA. STAT. tit. 12A, § 1-102(2)(c) (1981)). The Oklahoma Supreme Court also used the UCC decisions of other states to inform its own holdings in *Barker v. Allied Supermarket*, 596 P.2d 870, 871 (Okla. 1979) and *Mid-Continental Casualty Co. v. First National Bank and Trust Co. of Chickasha*, 531 P.2d 1370 (Okla. 1975), explaining in the latter case that it found the decisions of the other states to be "viable and persuasive." 531 P.2d at 1373.

Furthermore, as we explained above, the requested instruction was indeed a correct statement of law under the Oklahoma UCC. Nevertheless, we review a trial court's decisions regarding jury instructions for abuse of discretion. *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir. 1993), and the exclusion of one correct statement of law does not necessarily constitute error. Rather, "[t]he instructions as a whole need only convey a correct statement of the applicable law." *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1411-12 (10th Cir. 1988). In considering the instructions on appeal, we take into account "all the jury heard,

and from the standpoint of the jury, decide not whether the charge was faultless in every particular, but whether the jury was misled in any way." *Id*. at 1411 (internal quotations omitted).

> A contract for sale may be made in any manner sufficient to show agreement, including *language or conduct* by both parties which recognizes the existence of such a contract.
> A contract for sale may be found to exist even though the moment of its making is undetermined.
> Even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

> A contract may be express or implied. An *express contract is set out in words*, either spoken or written. An *implied contract is created by the acts or conduct* of the parties. No particular form is required for *words or conduct* to create either an express or implied contract.

App., vol. I, at 161-62 (emphasis added). The instructions were correct statements of law, taken from OKLA. STAT. tit. 12A, § 2-204 and Oklahoma Uniform Jury Instruction 23.3, respectively. *See* App., vol. I, at 211. The court found these instructions "made it clear that formation of a contract depends upon the parties' objective manifestations of agreement, rather than upon their subjective intent," *id*. at 212. We agree.

There was further support for the objective requirements in the definitions of "offer" and "acceptance." The jury was told a party could "manifest its intent

-20-

to be bound by an agreement by *words or by conduct* from which a reasonable person could find that the party intended to be bound by the agreement" and further that "*[c]onduct* by both parties which recognized the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." *Id.* at 164, 166 (emphasis added).

There was one problematic instruction, however. The jury was told:

> In this case, you must decide the meaning of the Ronan quotation to NESCO dated February 14, 1996. To do this you must decide what the intent of the parties was when Ronan made and NESCO received that quotation.
> To decide what their intent was you should first examine the language of that quotation. You may also consider the circumstances under which Ronan made and NESCO received the quotation, *and what the parties themselves believed the terms of the quotation meant* as shown by the evidence. You may also consider the past dealings of the parties and the language of previous quotations.

*Id*. at 167 (emphasis added). The italicized language appears to allow consideration of subjective intent. NESCO never objected to this language during the preparation or communication of the jury instructions. It now argues that this language is particularly problematic given the trial testimony regarding Ronan's internal policy against nonstandard contracts. It contends its proffered instruction on disregarding subjective intent would have cured any potential for improper considerations by the jury. While that may be true, we believe the jury instructions as a whole conveyed an acceptable statement of Oklahoma contract law. The court's decision to exclude the proffered instruction is not reversible

-21-

error.

## IV

## CLAIM AGAINST MOTOROLA

Finally, NESCO contends the trial court erred in allowing Ronan to cross-examine Charles Nance about NESCO's lawsuit against Motorola.  NESCO argues mention of the suit against Motorola was unfairly prejudicial to its case and posed a danger of distracting the jury from the true issues at hand.  However, the disputed questions came in response to Mr. Nance's assertion that he did not blame Motorola for the problems that occurred in the Tinker project.  *See* App., vol. II, at 363.  In the face of that assertion, it was appropriate for Ronan to point out that NESCO had, indeed, blamed Motorola for its problems.  Moreover, the court was careful to limit the scope of the Motorola questions, and the cross-examination moved on to other topics after a single question.  *See id*. at 364-66. The district court did not abuse its discretion in allowing the Motorola question.

## V

The judgment of the district court is **AFFIRMED**.