**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 11, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SAVON GERMAIN CARTER and
CHRISTINA MARIE EICHLER,

    Defendants - Appellants.

No. 18-8014, 18-8015
(D.C. No. 1:17-CR-00167-ABJ-1)
(D.C. No. 1:17-CR-00167-ABJ-2)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.
_____

A federal jury convicted Savon Carter and Christina Eichler of the sole count charged against them—conspiracy to distribute 500 grams or more of a mixture or substance containing a detectible amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(l), (b)(1)(A), and 846. Carter and Eichler have individually appealed, challenging their respective convictions and sentences.[1] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Carter and Eichler filed separate appeals. Because of the substantial overlap in the issues, we have consolidated their appeals in this order.

# BACKGROUND

The defendants, Christina Eichler and Savon Carter, both hail from Utah. Eichler lived in Wyoming from May to July 2016, after which she returned to Utah, where she and Carter cohabitated as a couple in Midvale, Utah, a suburb south of Salt Lake City. Eichler returned to Wyoming every week or two to visit her two teenage sons, who were living there in youth homes. But Eichler also traveled to Wyoming for a second reason: to sell methamphetamine.

On September 18, 2016, during one of these trips to Wyoming, a Utah state trooper stopped Eichler for speeding in her Chrysler PT Cruiser near Park City, Utah. Eichler was on her way to sell "a couple ounces" of methamphetamine and "some marijuana" to a Wyoming resident named Darrell Gilson at a Walmart in Evanston, Wyoming. Carter's ROA vol. 3 at 299:12. The state trooper smelled raw and burnt marijuana wafting from Eichler's car, so he searched the car and her purse. He found about an ounce of marijuana and an ounce of methamphetamine. He arrested Eichler and booked her into the Summit County, Utah jail. While detained, Eichler repeatedly called Carter from the jail system's recorded line. Among other things, Carter and Eichler discussed obtaining money from their associates for Eichler's bond. Carter and Eichler also discussed the need for Carter to sell something to Gilson while Eichler was detained. Eichler told Carter, "Tell [Gilson], like, I can handle what Christina handled for you." Govt. Exhibit 14A. Carter related to Eichler his conversation with Gilson, in which Carter told Gilson that he should chip in to help post Eichler's bond because "she got pulled over going to meet you." *Id.*

2

According to Gilson, Carter later told Gilson that he could sell him methamphetamine at the same price Eichler was selling.

While in jail in Summit County, Eichler met a woman named Sadie McKenna, a methamphetamine user since childhood. Because Eichler's driver's license was suspended after her arrest, she began paying McKenna $50 to give her rides to Wyoming, telling McKenna that she was traveling to Wyoming to see her children. McKenna drove Eichler to Wyoming three times. During these trips, McKenna never saw Eichler use methamphetamine.[2]

For their first trip, Eichler and McKenna traveled to Green River, Wyoming in Eichler's PT Cruiser to visit George Maestas, who had pitched in $250 for Eichler's bail. After arriving, Eichler met with Maestas alone in a room in his trailer for a while. McKenna didn't know what they were doing, but according to Maestas, Eichler was selling him methamphetamine. Afterward, Eichler visited her children, while Maestas and McKenna smoked methamphetamine together. While there, McKenna saw several people coming and going from the house: knocking on the door, coming inside to talk to Maestas, and staying for only five or ten minutes. After Eichler returned from visiting her children, she and McKenna returned to Utah.

For the second trip, McKenna drove Eichler back to Green River, this time to sell Eichler's PT Cruiser to Maestas. Maestas paid $1,000 for the car. After selling the car, Eichler and McKenna left to gamble and later returned to stay the night at

---

[2] McKenna testified that she obtained methamphetamine from Eichler only one time—about $10 worth—and that Eichler did not charge her for it.

Maestas's house. Again, people were coming and going from the house all night and smoking methamphetamine. One of these people was Gilson. With the PT Cruiser sold, Eichler and McKenna needed another car to get back to Utah, so Eichler reached out to Gilson, who agreed to sell Eichler a Chrysler 300. Because the car needed some repairs before it was drivable, Gilson drove Eichler and McKenna back to Utah. Gilson later drove to Utah in the purchased car (that he had supposedly repaired) to deliver it to Eichler.

For the third trip, Eichler and McKenna drove Gilson back to Wyoming after he delivered the Chrysler 300. On the way, the car would "just start chugging and stop." Carter's ROA vol. 3 at 400:18. Gilson was able to temporarily fix the issue, but it was a continuous problem during the drive. Because of the car's ongoing mechanical problems, Eichler and Gilson began haggling over the price. According to Gilson, Eichler ultimately gave him three ounces of methamphetamine, a quarter pound of marijuana, and cash in exchange for the Chrysler 300.

Later, Gilson began purchasing methamphetamine from Eichler and Carter at their house in Midvale. Initially, Gilson would buy from Eichler, but then began buying from Carter, although Eichler was present at the house for those transactions. At some point, Gilson stopped buying from Eichler and Carter and started buying from McKenna, because she could obtain methamphetamine at a better price.

When he couldn't get in touch with McKenna, Gilson would buy from Michael Flores (the third person charged in the conspiracy), who would obtain methamphetamine from Carter and Eichler. Flores had met Eichler sometime near

4

September 2016. Like Gilson, Flores had first bought methamphetamine from Eichler, but later began buying it from Carter instead (though Eichler was sometimes at the house). On one occasion, Gilson was in the room when Carter delivered the methamphetamine to Flores, and Carter became angry with Gilson because he had been buying from McKenna instead of from him.

At that point, DCI agents asked Flores to facilitate a controlled purchase with Eichler and Carter, and Flores agreed. Flores called Carter from his cell phone. In the calls, which the DCI agents recorded, Flores told Carter that he was "stranded" in Evanston and asked if Carter could "come see" him. Govt. Exhibit 15A. Flores told Carter to "bring whatever he c[ould]" because he had "a little bit of bread" to "play around with."[3] Govt. Exhibit 15A. Flores asked, "you know what I mean?", to which Carter responded, "Yeah, OK, I'll call you right back." *Id*.

Around September 2016, agents of the Wyoming Division of Criminal Investigation (DCI) began investigating Flores and Gilson for distribution of methamphetamine. After about nine months of surveillance, DCI agents arrested Flores in Green River on May 10, 2017, and in Flores's backpack they found several bags of marijuana and about four ounces of methamphetamine. Flores agreed to cooperate in DCI's investigation and told the agents that his suppliers were Eichler and Carter. Gilson was later arrested on June 6, 2017.

---

[3] Flores explained at trial that "bread" referred to money. ROA vol. 3 at 502:4–6.

In addition to making calls, Flores allowed DCI agents to send text messages from his phone to Carter. From Flores's phone, DCI agents texted Carter that Flores was staying at a certain room in an Evanston motel. Carter responded that Eichler was on her way to meet Flores there. The next morning, May 12, 2017, Eichler arrived at the motel room, where DCI agents questioned and searched her. Despite finding nothing illegal on her person or in her vehicle, DCI agents arrested Eichler and booked her into Uinta County Detention Center.[4]

After Eichler's arrest, DCI agents continued sending text messages to Carter from Flores's phone:

> **Flores:** Christina said she has no dinner for me . . . she said she had to go to off track betting and then would come back to my room . . . what's going on
> **Carter:** What??? She['s] gambling??? She doesn't have any money
> **Flores:** What's going on I thought she was bringing me up some dinner
> **Carter:** Huh?? No she was just picking u up
> **Flores:** Ooooo u got dinner at home?
> **Carter:** Kan get some . . . are we talking salad??
> **Flores:** . . . salad for dinner and snow if the weather is bad tonight
> **Carter:** Same order
> **Flores:** Usual
> **Carter:** Koo . . . no 5000$
> **Flores:** 3000 $ ? [I] have to keep a little in pocket
> **Carter:** Ooooh
> **Flores:** But could do the 5 if it works better for both of us
> **Carter:** Sounds good

Govt Exhibit 21.

---

[4] Though the DCI agents testified that they executed a probable-cause affidavit, the record does not indicate the basis for probable cause. Presumably, they asserted probable cause to believe Eichler was selling methamphetamine, based on her driving to meet Flores and the preceding text exchange.

While in custody at Uinta County Detention Center, Eichler placed a recorded call to Carter. During the call, Carter asked Eichler, "Oh my god, what happened?" Govt. Exhibit 29A. Eichler responded, "E-dub." *Id*. Carter then asked, "Who!?" *Id*. Eichler responded, "Mike [Flores]." *Id*. Eichler then said, "My charge is conspiracy to deliver." *Id*. Carter responded, "You didn't have anything!" *Id*.

In an indictment filed on July 20, 2017, a federal grand jury charged Carter, Eichler, and Flores with conspiracy to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(l), and (b)(1)(A). Flores pleaded guilty and agreed to continue cooperating. Eichler and Carter opted to proceed to trial. Meanwhile, Gilson and McKenna were charged in a separate drug-conspiracy indictment. Like Flores, they each agreed to plead guilty and testify against Carter and Eichler in exchange for a favorable sentencing recommendation from the government.

Consistent with Rule 404(b) of the Federal Rules of Evidence, the government notified Eichler and Carter of its intent to offer evidence of other crimes and wrongs that they had committed but were not charged with, including distributing marijuana. The government did not concede that the marijuana evidence was governed by Rule 404(b), but rather argued that it was inextricably intertwined with the methamphetamine charge. Eichler and Carter filed written objections to the possible Rule 404(b) evidence. Relevant here, the district court said the following at a pretrial hearing on the proposed evidence:

I have thought about the marijuana thing. I just don't see a way that in terms of telling the story of this case that it can be avoided. You would like everything to be totally sanitary, but that isn't the way human beings work. Perhaps, it can be handled by way of some sort of instruction later on that reminds the jury that all we are considering is the charge in this case. . . . I think I have one that is included that is pretty close to doing that in the instruction package at this point.

Carter's ROA vol. 3 at 190:1–10.

Trial began on November 28, 2017 and lasted four days. Gilson, Maestas, Flores, and McKenna all testified for the government, as did several DCI agents involved with the investigation.

Eichler and Carter each testified at trial. During her testimony, Eichler admitted having consumed methamphetamine with Gilson, Flores, and Maestas while she was in Wyoming to visit her sons, but she denied ever selling it. Carter also denied selling methamphetamine. Both Carter and Eichler struggled to explain what they meant during their recorded phone and text conversations. For example, Carter struggled to explain how he knew that Eichler "didn't have anything" when she was arrested in Evanston. ROA vol. 3 at 660:8–16. And when asked what "E-dub" means, Carter and Eichler explained that it refers to a "foul person," *id.* at 656:1–13, or a "person of questionable moral character," *id.* at 686:11–20. But they struggled to explain why there was no need to elaborate on how or why Flores was "E-dub."[5] *Id.* at 656:19–657:7, 686:16–687:11. Similarly, Carter struggled to explain his text-

---

[5] For example, the government asked Eichler, "So when you tell Mr. Carter that Mike is, 'E-Dub. Leave it there,' why are you telling him that?" Eichler responded that "I didn't want to discuss it further. I didn't understand what was going on. I was very upset." Carter's ROA vol. 3 at 687:6–9.

message conversation with Flores. One of the DCI agents testified that "salad" is slang for "marijuana," *id.* at 238:5–7, but Carter insisted that he was referring to food, and that salad is "one of [Flores's] favorite dishes," *id.* at 665:3–4. As for Flores's asking about "snow," Carter testified that he thought it was a typo and didn't think anything of it. *Id.* at 648:17–649:25, 666:7–667:4. But the DCI agent who sent the messages from Flores's phone testified that "snow" is slang for "methamphetamine." *Id.* at 580:6–8. When asked what he meant by "same order," Carter testified that he was referring to "[t]he same order of operations," as in "salad, dinner, . . . ribs, [video games], TV." *Id.* at 667:5–16. And when asked what he was referring to when he texted, "Koo, . . . no "$5,000?," Carter maintained that he was referring to money that Flores was purportedly going to pay Carter to help him fix his car. *Id.* at 668:7–21.

All told, the jury heard evidence that Eichler and Carter sold more than a kilogram of methamphetamine.[6] First, Maestas testified that he had bought three ounces and 19 grams[7] of methamphetamine from Eichler, usually paying around $600 for an ounce. Second, Flores testified that Eichler had sold him methamphetamine three times—19 grams for $300 the first time, 20 grams for $350 the second time, and 16 grams for $300 the third time—for a total of 55 grams. Flores also testified

---

[6] There are 28.35 grams in an ounce.

[7] Maestas testified that he intended to buy an ounce, but that Eichler was "short" and provided only 19 grams, so he paid only $300. Carter's ROA vol. 3 at 421:10–17.

that he bought methamphetamine from Carter eight times, usually obtaining between one and two ounces each time. But on two of these eight occasions, Flores and Gilson pooled their money to buy four ounces from Carter, for a total of eight ounces.[8] Third, Gilson testified that Eichler had sold him between eight and eleven ounces of methamphetamine: one ounce two or three times at Maestas's house, one to two ounces on two occasions at his (Gilson's) house, three ounces for the Chrysler 300, and one ounce at a hotel in Wyoming. Gilson also testified that he had bought methamphetamine from both Eichler and Carter at their house in Midvale "[o]nce a week for at least a couple months" and bought "at least a couple ounces" on every trip, "sometimes four or five ounces."[9] *Id.* at 306:25–307:9. Gilson paid $600 per ounce.

After the close of evidence, the court held a jury-instruction conference. Relevant here, Eichler and Carter proposed that the court instruct the jury on the "buyer-seller" defense. This defense, as provided for in the Seventh Circuit's pattern jury instructions, provides:

> A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of [a drug] do not enter into a conspiracy to [] distribute [the drug] . . . simply because the buyer resells the [drug] to others, even if the seller knows

---

[8] Gilson's testimony differed slightly from Flores's on this point. Gilson testified that he and Flores pitched in and obtained eight ounces of methamphetamine from Carter on one occasion, rather than four ounces on two separate occasions.

[9] The jury also heard evidence that Eichler intended to sell another one to two ounces of methamphetamine to Gilson, because Eichler was on her way to meet Gilson when she was stopped with an ounce of methamphetamine (though Gilson recalled the transaction as being for two ounces).

that the buyer intends to resell the [drug]. The government must prove that the buyer and seller had the joint criminal objective of further distributing [the drug] to others.

Seventh Circuit Criminal Pattern Jury Instructions, No. 5.10(A) (2012). The court denied the request for the instruction. Despite their pretrial objection, neither Eichler nor Carter proposed a limiting instruction regarding references to the marijuana.

After deliberation, the jury found both Eichler and Carter guilty of one count of conspiracy to distribute methamphetamine. The jury instructions referenced the specific quantity set forth in the indictment—500 grams or more of methamphetamine—but did not inform the jury that it must find that quantity beyond a reasonable doubt. But if the jury found the defendants guilty of the charged conspiracy, a special interrogatory to the verdict form gave the jury three choices on the methamphetamine weight—500 grams or more, 50 grams or more, or less than 50 grams. The special interrogatory required the jury to find the given methamphetamine weight beyond a reasonable doubt. Here, the jury marked its finding that Carter and Eichler had conspired to distribute at least 500 grams of a mixture or substance containing a detectible about of methamphetamine.

On February 12, 2018, the district court sentenced Carter. Carter's presentence investigation report (PSR) assigned a base offense level of 30, under U.S.S.G. § 2D1.1(c)(3) (applying when the offense involves at least 500 grams but less than 1.5 kilograms of methamphetamine). Based on Carter's and Eichler's alleged threats against McKenna before trial, the PSR applied the two-level enhancement under § 3C1.1 for obstruction of justice. Carter objected to the PSR on various grounds,

including that his advisory guidelines range of 151 to 188 months was too severe when considering the sentencing factors listed at 18 U.S.C. § 3553(a). Ultimately, the court varied downward from the advisory guideline range, sentencing Carter to 135 months' imprisonment.

Eichler was sentenced the same day as Carter. Eichler's PSR tracked Carter's on the drug weight and obstruction of justice, again providing a total offense level of 32. Relevant here, Eichler objected to the obstruction enhancement, arguing that there was no evidence that she threatened McKenna. In response, the government argued that "independent of any witness intimidation, Ms. Eichler should receive the enhancement for committing perjury at trial." Eichler ROA vol. 3 at 117. At sentencing, the government did not call McKenna to testify about the alleged intimidation, relying instead on Eichler's alleged perjury.[10] Eichler objected, arguing that the jury's verdict simply indicated it "believed [the government's] witnesses over her." *Id.* at 799:13–14. Ultimately, the district court applied the enhancement and sentenced Eichler to 121 months' imprisonment (one month more than the mandatory-minimum 120 months arising solely on the methamphetamine-conspiracy conviction).[11] Carter and Eichler both timely appealed.

---

[10] At the sentencing hearing, the court noted that McKenna had "clammed up" during her trial testimony but acknowledged that the government was relying solely on Eichler's alleged perjury for the obstruction-of-justice enhancement. Eichler ROA vol. 3 at 801:23.

[11] Carter also received an obstruction-of-justice sentence enhancement based on his alleged perjury at trial, but Carter is not challenging that enhancement on appeal.

**DISCUSSION**

Eichler and Carter raise a total of six issues. First, both Eichler and Carter argue that the district court erred by refusing to instruct the jury on their "buyer-seller" defense. Second, Carter and Eichler contend that the evidence was insufficient to sustain their respective convictions. Third, Eichler argues that the district court abused its discretion by failing to provide instructions limiting the jury's consideration of testimony about marijuana. Fourth, Eichler contends that the court erred in imposing the obstruction-of-justice sentence enhancement. Fifth, Carter argues that the district court erred by failing to instruct the jury that the government needed to prove—beyond a reasonable doubt—that the conspiracy involved at least 500 grams of methamphetamine. Finally, Carter challenges his sentence, arguing that the district court failed to make specific findings as to the amount of methamphetamine involved in the conspiracy and that the evidence was insufficient to sustain a finding that he sold 500 grams or more of methamphetamine. We consider each issue in turn.

## I.    The district court did not err by refusing to give the proposed "buyer-seller" instruction.

Carter and Eichler argue that the district court erred by refusing to give their proposed "buyer-seller" instruction. As noted, this instruction would have required the government to prove that Carter and Eichler had maintained a "joint criminal objective of further distributing [drug] to others." Seventh Circuit Criminal Pattern Jury Instructions, No. 5.10(A) (2012); *see also United States v. Turner*, 93 F.3d 276,

13

285–86 (7th Cir. 1996). We review jury instructions de novo to determine whether they "adequately apprised the jury of the issues and the governing law." *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir. 1998).

"To obtain a conspiracy conviction, the government must prove: (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators." *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011). "Interdependence is present when 'each alleged coconspirator depends on the operation of each link in the chain to achieve the common goal.'" *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992) (brackets and citation omitted). Each element must be proved beyond a reasonable doubt. *Id.* To convict, "[t]he jury may infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *United States v. Johnston*, 146 F.3d 785, 789 (10th Cir. 1998) (citation and internal quotation marks omitted). And "conspirators are responsible for crimes committed 'within the scope of the unlawful project' and thus 'reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" *United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992) (quoting *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946)).

The government's theory at trial was that Carter, Eichler, and Flores were each voluntary and interdependent members in an agreement to distribute 500 grams or more of methamphetamine. *See Foy*, 641 F.3d at 465. But Carter and Eichler argue that the

14

government, under the Seventh Circuit's buyer-seller rule, needed also to prove that their drug customers in turn sold those drugs to others and then returned some of the profits to Carter and Eichler. But our circuit has explicitly rejected the Seventh Circuit's interpretation of the buyer-seller rule. *See United States v. Gallegos*, 784 F.3d 1356, 1360 (10th Cir. 2015) ("[The Seventh Circuit's] interpretation of the buyer-seller rule is contrary to this court's precedent."). Instead, our court recognizes that "the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy."[12] *United States v. Ivy*, 83 F.3d 1266, 1285–86 (10th Cir. 1996). We therefore conclude that the district court did not err by refusing to instruct as Carter and Eichler requested.

## II. The evidence at trial was sufficient to support Carter's and Eichler's convictions.

Carter and Eichler each argue that the evidence at trial was insufficient to establish that they were guilty of a conspiracy to sell 500 grams or more of methamphetamine. We review de novo any challenges to the sufficiency of evidence. *United States v. Ramos-Arenas*, 596 F.3d 783, 786 (10th Cir. 2010). In doing so, we review "the evidence and its reasonable inferences in the light most favorable to the government." *Id.* We will reverse "only if no rational trier of fact could have found the essential elements of the crime

---

[12] The government argued at trial that Carter, Eichler, and Flores were each distributors—not consumers—who agreed *among each other* to sell to consumers.

beyond a reasonable doubt." *Id.* (quoting *United States v. Brown*, 400 F.3d 1242, 1247 (10th Cir. 2005)). Carter and Eichler raise several arguments to support their respective sufficiency challenges.

First, Carter argues that the only evidence supporting the government's conspiracy charge was (1) that Carter was in a relationship with Eichler, (2) that Carter entered into a series of buy-sell agreements with Flores, and (3) that Carter was aware that Eichler sold drugs to Flores. We disagree. Carter's "participation in or connection to the conspiracy need[ed] only be slight, so long as sufficient evidence exists to establish [his] participation beyond a reasonable doubt." *See Johnston*, 146 F.3d at 789. And a rational trier of fact could conclude that, beyond mere "slight" involvement, Carter worked closely with Eichler in selling methamphetamine. *See id.* For example, during Eichler's phone call from Summit County jail, Eichler and Carter agreed that Carter would continue selling to Gilson whatever Eichler had been selling him. Because Eichler had been pulled over with methamphetamine and because Gilson testified that Eichler was on her way to sell him methamphetamine, a rational trier of fact could conclude that Carter was going to continue Eichler's methamphetamine sales to Gilson. Likewise, because Carter sent Eichler to pick up Flores at the motel in Evanston in response to Flores's texts requesting "snow," a rational jury could conclude that Eichler and Carter were working in tandem to sell methamphetamine to Flores.

Second, Eichler argues that the government failed to prove beyond a reasonable doubt that 500 grams or more were "directly attributable" or reasonably foreseeable to her. Eichler Opening Br. at 23. Speaking to her own methamphetamine distribution,

16

Eichler says that "[a]t most, the evidence is that Ms. Eichler sold or gave away a maximum of 243 grams of methamphetamine to people she knew and hung out with in Wyoming." *Id.* at 25. She argues that the testimony supporting her conviction is "highly suspect," because the individuals who testified against her were all drug addicts who struggled from memory loss. *Id.* at 23. But as the government correctly notes, Eichler presented this argument to the jury, and we cannot second-guess the jury's credibility determinations. *United States v. Yoakam*, 116 F.3d 1346, 1349 (10th Cir. 1997). These matters are properly in the jury's province, and Eichler offers nothing to upset that rule. Instead, "we must accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Id.* (citation and internal quotation marks omitted).

In short, viewing the evidence in the light most favorable to the government, a rational trier of fact could conclude that Eichler and Carter (1) agreed to distribute more than 500 grams of a mixture or substance containing a detectible amount of methamphetamine, in violation of federal law, (2) knew the objectives of the agreement, (3) voluntarily joined the conspiracy, and (4) acted interdependently. *See Foy*, 641 F.3d at 465; *Evans*, 970 F.2d at 670.

## III. The district court did not abuse its discretion in admitting testimony about marijuana without a limiting instruction.

Eichler argues that the district court should have excluded all testimony about marijuana or at least given a limiting instruction to minimize its prejudicial impact. When a defendant objects to the admission of evidence at trial, we review the trial court's decision to overrule the objection for abuse of discretion; otherwise, we

review for plain error. *Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1001 (10th Cir. 2001). Here, Eichler objected before trial to testimony about marijuana, but the trial court made no "definitive" ruling. *See id.* And Eichler did not request a limiting instruction during trial or even at the jury-instruction conference. But because both Eichler and the government agree that abuse-of-discretion review should apply here, we need not decide whether Eichler preserved the issue. *See McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) ("A party cannot count on us to pick out, argue for, and apply a standard of review for it on our own initiative, without the benefit of the adversarial process, and without any opportunity for the adversely affected party to be heard on the question."). We will therefore review Eichler's claim for an abuse of discretion. Under this standard, we will not reverse "unless we find that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Nicholson*, 17 F.3d 1294, 1298 (10th Cir. 1994) (citation and internal quotation marks omitted).

As a threshold matter, the parties disagree about whether the marijuana evidence constitutes character evidence under Rule 404(b) of the Federal Rules of Evidence, or rather whether it was intrinsic evidence because it was inextricably intertwined with the charges. Evidence is admissible under Rule 404(b) only if (1) the evidence is offered for a proper purpose, (2) the evidence is relevant, (3) the evidence's probative value is not substantially outweighed by its potential for unfair prejudice; and (4) the district court, upon request, instructs the jury to consider the evidence only for the purpose for which it was admitted. *United States v. Becker*, 230

18

F.3d 1224, 1232 (10th Cir. 2000). But if the evidence is "inextricably intertwined" with the charged offense, as the government argues, then it falls outside Rule 404(b)'s ambit. *See United States v. Oles*, 994 F.2d 1519, 1522 (10th Cir. 1993) ("[A] 404(b) analysis does not apply to other acts which are so inextricably intertwined with the crime charged that testimony concerning the charged act would have been confusing and incomplete without mention of the prior act.") (citation and internal quotation marks omitted).

We agree with the government that the marijuana evidence is inextricably intertwined with the methamphetamine conspiracy "because it tended to elucidate the relationships among the members of the conspiracy and tended to show their course of dealings." *See United States v. Vasquez*, 422 F. App'x 713, 717 (10th Cir. 2011). For example, the jury would not have been able to understand the text message communications between Carter and Flores involving "salad" and "snow" without explaining what those words referred to. Similarly, the jury would not have received the full picture about Eichler's traffic stop in Utah without learning that the state trooper searched her car because he smelled marijuana. Moreover, whatever prejudice the marijuana evidence caused Eichler, it was slight. Accordingly, because it acted within "the bounds of permissible choice in the circumstances," the district court did not abuse its discretion by admitting the marijuana evidence or failing to give a limiting instruction. *See Nicholson*, 17 F.3d at 1298.

**IV. The district court did not err in enhancing Eichler's sentence for obstruction of justice.**

Eichler argues that the district court erroneously enhanced her sentence under

U.S.S.G. § 3C1.1., which provides for a two-level increase in the offense level if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. "Applicability of a guideline is an issue of law that we review de

novo, while issues of fact are reviewed under the clearly erroneous standard." *United*

*States v. Massey*, 48 F.3d 1560, 1572 (10th Cir. 1995).

When, as here, the obstruction-of-justice enhancement is based on alleged

perjury, the government must establish that the defendant (1) made a false statement

under oath, (2) concerning a material matter, (3) with the willful intent to provide

false testimony. *United States v. Hawthorne*, 316 F.3d 1140, 1146 (10th Cir. 2003).

"Of course, not every accused who testifies at trial and is convicted will incur an

enhanced sentence under § 3C1.1 for committing perjury." *United States v.*

*Dunnigan*, 507 U.S. 87, 95 (1993). For example, "an accused may give inaccurate

testimony due to confusion, mistake, or faulty memory." *Id*. For this reason, the

Supreme Court requires that, when the defendant objects, "a district court must

review the evidence and make independent findings necessary to establish a willful

impediment to or obstruction of justice, or an attempt to do the same . . . ." *Id.* But

"[t]he Tenth Circuit's standards are stricter than those expressed in *Dunnigan*."

20

*Hawthorne*, 316 F.3d at 1146. "We require that a district court be explicit about which representations by the defendant constitute perjury." *Id.* Moreover, we require that the court make explicit findings as to each element: falsity, materiality, and willful intent to provide false testimony. *United States v. Medina-Estrada*, 81 F.3d 981, 987 (10th Cir. 1996).

> Here, the district court made the following finding as to Eichler's perjury:

> Ms. Eichler explained that she had traveled to Wyoming to visit her children, admitted to sharing methamphetamine with various people: Gilson, Flores and Flores' sister, which directly contradicts Gilson's testimony that Ms. Eichler became his source, because she could provide it about $300 per ounce cheaper than he was getting it from others. Mr. Flores was involved with Mr. Gilson initially. Really[,] Flores was the guy who was living as a couch surfer for several years, and eventually, was introduced by—through Ms. Eichler—just through circumstances— to Mr. Carter. Ms. McKenna testified about their acquaintance which began that fateful arrest that occurred on the highway outside of Park City in September of 2016. It went on from there, and really involved her being the driver—McKenna being the driver on several trips to Wyoming and what she saw there, which proved at trial not to be much. The testimony of Mr. Maestas concerning what was occurring and his acquisition of methamphetamine from Ms. Eichler which was brought from—brought with her. . . . *I find that there is credible evidence of prevarication*—of obstruction in this matter. That it did involve material evidence in this case as I have referred to the testimony of Gilson, Flores, Maestas, and even McKenna, as well as the recorded statements of Ms. Eichler that occurred after her arrest.

Eichler ROA vol. 3 at 802:2–803:11 (emphasis added).

Eichler argues that the district court did not make findings as to willful intent, and that the record does not support a finding of perjury. We agree that the district court failed to make an express finding of willful intent. Indeed, the government admits that "the district court did not explicitly address the willfulness element."

21

United States' Combined Resp. Br. at 47. But we may "reject[] a requirement that the district court make explicit findings on every element required under Section 3C1.1 where the district court's ultimate conclusion is clear and the record unambiguously supports its conclusion." *United States v. Cayatineto*, 49 F. App'x 278, 284–85 (10th Cir. 2002). Here, the court's ultimate conclusion is clear, and the record supports a finding of willfulness. Eichler does not contend that her testimony resulted from "confusion, mistake, or faulty memory," *see Dunnigan*, 507 U.S. at 95, and the district court had a sufficient basis to find that Eichler had acted with willful intent when she denied selling methamphetamine in Wyoming. Because the record also supports a finding that Eichler's testimony was false and material, we conclude that the district court did not err in imposing the obstruction-of-justice enhancement. *See Hawthorne*, 316 F.3d at 1146.

V.     **The district court did not err by not instructing the jury on the specific quantity of methamphetamine that Carter and Eichler allegedly conspired to distribute.**

A methamphetamine conspirator faces a ten-year mandatory minimum sentence for an offense involving at least 500 grams, a five-year mandatory minimum sentence for an offense involving at least 50 grams, and no mandatory minimum sentence otherwise. *See* 21 U.S.C. §§ 841(b)(1)(A)(viii), (B)(vii), (C), and 846. But "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 103 (2013) (citation omitted). Therefore, under *Alleyne*, the mandatory minimum penalties under

22

§ 841(b) apply only if the jury finds the relevant drug quantity beyond a reasonable doubt. *See id*.

Here, Carter argues that the jury instructions did not tell the jury to use the beyond-a-reasonable-doubt standard in finding the quantity of methamphetamine involved in the conspiracy. Carter contends that this violated *Alleyne*. Because Carter failed to raise this claim below, we review for plain error. *United States v. Powell*, 767 F.3d 1026, 1029 (10th Cir. 2014). This requires Carter to show "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." *See id.* And (4), "[i]f he satisfies these criteria, [we] may exercise discretion to correct the error if [] it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *See id.* (citation omitted).

Carter relies on *United States v. Johnson*, 878 F.3d 925, 928 (10th Cir. 2017), where we vacated a sentence because the district court had relied on a special interrogatory that did not require the jury to find a specific quantity beyond a reasonable doubt. But unlike *Johnson*, the special interrogatory contained in Carter's verdict form required the jury to "unanimously agree, by proof *beyond a reasonable doubt*, that the quantity of methamphetamine that the Defendant, Savon Germain Carter, conspired to distribute, including all reasonably foreseeable acts and omissions of others in furtherance of the conspiracy" was less than 50 grams, at least 50 but less than 500 grams, or 500 grams or more. Carter's ROA vol. 2 at 35 (emphasis added). We thus reject Carter's jury-instruction challenge, because even

assuming Carter could demonstrate an error that is plain, he has failed to establish that the error affected his substantial rights. *See Powell*, 767 F.3d at 1029.

## VI. The district court did not commit plain error in calculating Carter's base offense level.

Finally, Carter challenges his sentence. The district court imposed a base-offense level of 30, based on the jury's convicting him of a conspiracy to distribute 500 grams or more of methamphetamine—based on his own acts and reasonably foreseeable acts of his co-conspirators. Accordingly, Carter's argument that the district court failed to make specific findings about the quantity Carter intended to distribute is misplaced. We have already rejected his argument that the jury's findings lack sufficient evidence to support them.

## CONCLUSION

For these reasons, we affirm.

Entered for the Court

Gregory A. Phillips
Circuit Judge